Statement.
MONROE, J.
Plaintiff demands $5,000 as damages for personal injuries, sustained, as he alleges, by reason of defective apparatus used in the mill in which he was employed by defendant. Defendant, by way of exception, sets up a compromise, and, the exception having been overruled, answers that the plaintiff assumed the danger incident to his employment, and that he was guilty of contributory negligence. There was a verdict and judgment for plaintiff in the sum of $425, the defendant has appealed, and the plaintiff has answered the appeal praying for an increase in the amount of the award.
The facts necessary to be considered in determining the validity and effect of the compromise, as we find them from the testimony in the record, are as follows:
The plaintiff had his arm broken whilst working in defendant’s mill between 2 and 3 o’clock on the morning of Thursday, January 15, 1903, and was immediately sent to the Charity Hospital in Shreveport. He was there asked whether he desired to consult a lawyer, and, upon his answering in the affirmative, Mr. Foster, of the law firm of Thigpen & Foster, was summoned by telephone, called on him between 9 and 10 o’clock, and entered into a contract, which was thereafter to be reduced to writing, to bring suit against the defendant for damages. Between 10 and 12 o’clock on the same day, Mr. West, defendant’s manager, had plaintiff removed to a private sanitarium, and gave instructions that no lawyers were to be permitted to see him. The next day Mr. Foster sent to the sanitarium, for plaintiff’s signature, a written instrument embodying the verbal contract between him and plaintiff of the day before, but his messenger was at first refused admittance to plaintiff’s room. After some telephoning, however, between Foster and the surgeon in charge of the sanitarium, and between the latter and West, the messenger was admitted, and the contract was signed, and a copy of it served on West.
On the Sunday following (January 18th), Calvin Bradford called upon plaintiff in a friendly way, and after a short visit, in which nothing was said about the latter’s claim against the defendant for damages, was in the act of leaving, when plaintiff requested him to ask Mr. West to come and see him, Bradford says, “about having the ease withdrawn”; and Dr. Schumpert, the surgeon in charge of the sanitarium, testifies that at a different time the plaintiff made a similar request of him. Bradford delivered the message the next morning (Monday, January 19th), and West, accompanied by Russell, one of defendant’s employés, went at once to the sanitarium and effected the compromise here in question, which was reduced to writing and signed by plaintiff in the presence of two witnesses at a later hour on the same day; and plaintiff also signed a letter, which West had caused to be prepared, and which was duly delivered, informing plaintiff’s attorneys of the compromise, and instructing them not to bring suit, as also a letter to defendant stating that he had no claim against it. West, testifying in regard to the matter, says that plaintiff “stated that he had done wrong in bringing the suit, and that he wanted to have it withdrawn; that he saw where he had made a mistake, *199 and tliat if lie [West] would take care of Mm and give liim his place back he would like very much to have the thing compromised and settled”; and he further testifies that the instrument evidencing the compromise and the letters mentioned were fully explained to plaintiff, were delivered to and read by him, and were signed by him without hesitation, intimidation, misrepresentation, or inducement; and this testimony is corroborated in different terms and degrees by Russell, Schumpert, and Kingsmore. ■ The instrument in question reads, in part, as follows:
“Know all men by these presents: That in consideration of the sum of $20 to me in hand paid by the Union Oil Co. of Shreveport, Louisiana, the receipt whereof is hereby acknowledged, and the assumption of all medical and surgical bills at the Sanitarium, and the further agreement to pay me running time (meaning work days) for six weeks, with a view of effecting a settlement and compromise I have released, acquitted and discharged, and do, by these presents release, acquit and forever discharge the said Union Oil Co. * * * of, and from, any and all costs, charges, claims, or demands, of whatsoever name or nature in any manner arising, or to grow out of, the accident by which I had my right arm broken on Thursday, January 15, 1903, on the third floor of the said mill,” etc.
The $20 referred to were paid upon the signing of the instrument, and the “running time” was paid, week by week, for three weeks thereafter, at the expiration of which period the plaintiff, through his counsel, repudiated the compromise, tendered back the money which had been received, and offered to pay his bill at the sanitarium, and the defendant tendered the balance of the running time called for by the compromise, and offered to give plaintiff light employment at its mill.
From the testimony of plaintiff we make the following excerpts: After stating that West and Murphy (the latter being another of defendant’s employes) had called on him op the day after the accident, and before he had signed the contract with his attorneys, he proceeds:
“They said they came to bring me some money, and they were going to give me $10, and 1 told them that I didn’t want that, and they asked me would $20 do, and I told them that I didn’t want that, that that wasn’t enough for my arm, and he said that he wasn’t giving me anything for my arm, that they were just giving me that to help me out. Q. Did you, at any time, tell them to see your attorneys? Did you tell them to see me, at any time? A. I did. Q. Did you tell them to see anybody else? A. That was after they carried me in another ward. Q. What happened then? A. Mr. West came out there to see me that evening. Q. What did he say then? A. He said, ‘You entered suit against me’ and I told him, ‘Yes, sir,’ and he said I played hell. Q. Then what? A. lie said I wasn’t going to get anything; said, if I got it, you all would get all the money, and I wouldn’t get any. Q. Who — your lawyers? A. Yes, sir. Q. Did anybody else come to see you besides Mr. West? A. Mr. Russell was out there. Q. What did Mr. Russell tell you? A. He said he carried his son up, and Mr. Currie hired him, and he didn’t know anything about machinery, and they put him to wprking machinery, and he got his fingers cut off, and he said he told them that he was going to sue them, and they said for him to go ahead and sue, and he sued, and he said he had to pay for that suit and pay for the sanitarium bill, too.. Q. Who else came to see you? A. Calvin Bradford. Q. What did he say? A. He didn’t say anything. He asked me how I was getting on, and I told him to ask Mr. West to come out there, and I asked Mr. West had he seen you all, and he said, ‘No.’ He said, ‘Let it alone.’ I told him I thought he was going to compromise.”
:¡; s*: sj: a*t sfc #
“Q. Well, what passed between you and Mr. West in regard to a compromise? A. He came out that evening, and said he was going to see Mr. Foster. Q. Mr. West said he was going to see Mr. Foster? A. Yes, sir; and the next time he came back, that was when I sent for him, and asked him if he had seen Mr. Foster, and he said that he had not seen him; that he was just going to let it alone; and I told him that was all right then. * * * Q. When that [referring to the written instrument evidencing the compromise] was brought to you, what was said to get you to sign that document? A. That evening when he was out there, and I asked him what about the case, and he said that he was going to let it alone, and I said it was all right, and he said it was best for me to compromise now, and I told him what Mr. Russell said about getting his little boy’s fingers cut off. Q. Well, we had that. A. Well, I told him twice; I told him when my wife was there, and told him that evening when he came up there to see me. Q. Did they say anything else to you? A. The first time they came and brought money they said they was going to give me that to take care of my family; that they didn’t have anybody to take care of them. By the Court: Q. Did you get that *201 $20? A. Tes, sir; I got that. He said he was going to give me that to take care of my family. He asked how many I had in my family. * * * Q. Galvin Bradford came to see you Sunday, didn’t he? A. Tes, sir; came down to the sanitarium. Q. He just called to see you because he knew you at the mill? A. Tes, sir. Q. He was a colored man? A. Tes, sir. * * * Q. When Galvin left, that Sunday evening, you told him to tell Mr. West to come up there, and next Monday morning Mr. West came up there? A. He didn’t come up until late in the evening. Q. Now, then, what did you and Mr. West agree on when he came? A. I asked him what about the case, and he said he was going to let it alone, and I told him that was all right then. They told me it was best to compromise, and Mr. Russell told me about the boy getting his fingers cut off. Q. Tou thought it was best, too, didn’t you? A. After they told me that, I did. Q. When Mr. West came back again, he came back with the compromise you all had agreed upon already written up, did he? A. Tes, sir. Q. Tou and he signed it, then, with two other witnesses? A. Tes, sir. * * * He gave you the $20 that evening? A. Tes, sir. Q. What else did they agree to do with you? A. Take care of my family. Q. And pay foi your running time? A. Tes, sir. Q. That is, when the mill run you were to get your pay? A. They said they were going to pay me for full time. They didn’t say anything about the mill running. Q. Tou understood that he was to give you $20 and pay your wages for six weeks? A. Tes, sir. Q. That is what you thought was the compromise? A. Tes, sir; that is what I thought. * * * Q. Did he not tell you that he was going to see that your bill at the sanitarium was paid? A. Tes, sir. Q. Tou knew that he was going to pay your bill there whilst the doctor was treating you? A. I don’t know, sir. After I didn’t sign that paper he said he was going to send me home, and the doctor asked me what I was going to do when he put me out in the cold, and I told him I wasn’t going to do nothing; that I had a home to go to. * * * Q. Mr. West didn’t tell you that? A. He said he was not going to pay my way. He said if I run a lawsuit he was not going to pay my way then. * * * Q. Did you not say, ‘Give me the papers; I can read them myself’? A. He asked me could I read, and I told him I could read. Q. Didn’t he hand you the papers? A. Tes, sir. Q. Did he not walk out of the room and leave you with those gentlemen? A. I don’t know whether he did or not. He may have went out. Q. Did he not tell you, in the presence of Dr. Abramson, that whatever you did he wanted you to do it of your own free will and accord? A. He was speaking to the other men. Q. Well, you heard it, didn’t you? A. Tes, sir. Q. And understood it? A. Tes, sir; I understood what he said to the other men.”
West testifies that nothing was ever said to the plaintiff, by him or in his presence, about not paying, his way at the sanitarium, and that he had no conversation with him about his attorneys, and, as to the occasion to which the plaintiff refers, he is corroborated by Russell, who also testifies that he did not mention his' son’s experience until some time after the compromise had been closed. Dr. Schumpert, who seems to have been present on one or more occasions when the matter was under discussion, testifies that it was the plaintiff who wanted the compromise, and that, before it was signed, “he [West, or some other person] just explained to him the effects of the documents, or whatever it was, and in a way that the negro would be most likely to understand it,” and “so that a man of ordinary intelligence could understand it,” and that every time West spoke about it he told the plaintiff “he could sign it or not, just as he pleased.”
Dr. Schumpert, who was sworn as a witness for the plaintiff, also testifies that the plaintiff was brought to the sanitarium at the instance of West, who said that he did not want any lawyers to see him, and, being interrogated by plaintiff’s counsel, his examination proceeds as follows:
“Q. I will ask you whether or not you car-, ried out his request in that respect? A. I tried; I did my best. Q. I will ask you whether you did not finally, at my suggestion, phone to Mr. West and ask him to release you from that request? A. Tes, sir. I stated to Mr. West that 'you insisted on coming up to see him, and that I had no right to keep you out, and Mr. West told me to let you go in and see him. Q. I first phoned you, and you stated that you had promised Mr. West not to allow the negro to be seen, and that you did not want to violate that promise to Mr. West? A. Tes, sir; Mr. West was responsible for his bill, had had him put there, and I thought that, as long as I had promised it, it was my duty to fulfill it.”
The conversations over the telephone between plaintiff’s counsel and Dr. Schumpert. and between Schumpert and West, on the subject of the exclusion of lawyers from plaintiff’s room, took place on January 16th, before the signing of the contract between plaintiff and his counsel, and occupied, per *203 haps, 10 or 15 minutes, after which it does not appear that there was any attempt to exclude any one; nor does it appear that the plaintiff was ever informed that such an attempt had heen made, or that he was at any time, whilst in the sanitarium, coerced, intimidated, deceived, or pain-ridden.
Opinion.
Counsel for plaintiff say in their brief;
“That so-called compromise reeks, from the moment of its conception in the brain of West, to the day of its half birth under the typewriter of eminent counsel and the coerced and pain-ridden pen touch of Napoleon Russ, with every element of intimidation, false imprisonment, violation of personal liberty and free thought and action, and false explanation that the ingenuity of the industrious servitors in the legal, medical, and commercial departments of an up to date trust could devise.”
It may be, and it is, natural to suppose that West conceived the idea of effecting a compromise as soon as the accident happened, and it may be that such an idea occurred to the plaintiff, and it seems not unlikely that the two had some conversation on the subject prior to the 18th of January, though the record is obscure upon that point. It is, however, absolutely certain that it was the plaintiff who, upon the day mentioned (three days after his arm had been broken, and two days after he had signed the contract, sent to him for that purpose, under which his counsel are prosecuting this suit), took the initiative by sending for West to come and see him, two witnesses say, about compromising his claim, and he says, in substance, in order that he might find out what progress, if any, had been made in that direction by West and his (plaintiff’s) attorneys. I-Ie admits that West then told him that he had not seen his attorneys, and that he had, or was going to, let the compromise alone, the intimation being clear that he did not intend to see plaintiff’s attorneys or attempt to effect any compromise through 'them. Nevertheless, the result of the interview, to which the plaintiff, of his own motion, had thus invited West, was the agreement of compromise, which was reduced to writing, signed by plaintiff, and partly executed, at a later hour on the same day, and under which the plaintiff thereafter received three successive payments of money, on January 24th, January 31st, and February 7th; and the only reasons which he now assigns for repudiating it are, not that he was coerced, or pain-ridden, or intimidated, or imprisoned, or deprived of freedom of thought, or influenced by false explanations, but, as we understand his testimony, because Russell told him that he (Russell) had lost a damage suit, and had been obliged to pay the costs and the expenses of having his son treated at the sanitarium, and because, as he says, West told him that he would not continue to pay his expenses if he brought suit for damages, and the assistant surgeon of the sanitarium asked him what he would do if he were turned out of that institution.
It is not suggested that the statement made by Russell was untrue, and Russell swears that it was not made until after the compromise had been effected. If it was made before, it was for the plaintiff to consider or disregard it in determining his own course, and he could have consulted his counsel if he had thought proper to do so. West denies that he did so, but, if it be true that he told the plaintiff that he would not continue to pay his expenses if he brought suit for damages, he told him something that he had a right to tell, and that plaintiff might fairly be presumed to have known without being told, since he appears to be endowed with at least the average intelligence of his class, and is somewhat better equipped in the way of education; the trouble being that neither his intelligence nor his education seem to have inspired him with anything like an honest regard for the dbligations of his contracts. Dr. Abramson, the surgeon to whom the ques *205 tion mentioned is attributed, is said to have been absent from Shreveport when the case was tried, and was not examined as -a witness. That the plaintiff was not influenced by his question, however, is shown by his answer, to the effect that “he had a home to go to.” Some comment is made upon the fact that Bradford, in giving his testimony, fell into certain errors; but those errors are of no consequence, since upon the material point he is entirely corroborated by the plaintiff himself. It is objected that the instrument of compromise describes the defendant as “the Union Oil Co. of Shreveport, Louisiana,” instead of “the Union Oil Co. of New Jersey” and that said instrument is not signed by the defendant. We recall nothing in the record which proves that the defendant may not properly be called the Union Oil Company of Shreveport; but, in any event, there is no question as to its identity, and the objection is frivolous; and equally so is the other objection, since the parties to the contract have acted under, and partially executed, it, and the failure of the defendant to sign was evidently a mere oversight.
There is no rule of law, morals, or ethics which denies to the ordinary citizen the right to compromise, with the person asserting it, a claim against him for damages, nor is that right defeated by any previous employment of counsel to prosecute such claim; and, when the compromise is effected in the manner provided by law, it has the force of the thing adjudged, and cannot be attacked collaterally, or for error of law or lesion, in a direct action. Civ. Code, arts. 3071, 3078-3080; Adle et al. v. Prudhomme, 16 La. Ann. 343; Ackerman v. McShane, 43 La. Ann. 507, 9 South. 483; Oglesby v. Attrill, 105 U. S. 605, 26 L. Ed. 1186.
In the instant case the collateral attack has been made and met, and no good purpose would be subserved by relegating the parties to further litigation.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that plaintiff’s demand be now rejected, and his suit dismissed at his cost in both courts.
LAND, J., recused.