PROVOSTY, J.
Plaintiff’s son was run over and killed by one of the electric cars of the defendant company, and plaintiff sues in damages. One of the defenses is that plaintiff made a compromise by which she agreed to accept $500 in full settlement. Plaintiff does not deny that she agreed to this compromise, but contends that it is not binding upon her for the reason that she was so grief stricken and unnerved at the time she entered into it that she did not know what she was doing. The evidence shows conclusively that plaintiff knew perfectly well what she was doing, and that the compromise was her deliberate act. The facts are as follows:
Plaintiff is a widow and had been a widow for about 11 years at the time this compromise was made. 1-Iow old she was, the record does not show. She has six children, the youngest of whom is 16. Her son was 31, and unmarried. She and her son lived with one of her married daughters in New Orleans. She had been living here 1% years, and he “a couple of months or so.” He was very regular in his habits. On a 'Saturday night he failed to come home, which made plaintiff very uneasy. The next morning, at about 9 o’clock a policeman came to plaintiff’s daughter’s house and inquired of her if “Jim Daley lived there,” and, on plaintiff’s answering, “Yes,” said, “Well, he is dead,” and added that his body was at the Charity Hospital. Plaintiff went at once to the hospital and there saw the body.
“He was already shrouded, and so I could just see his face. I mean, he was laid out, 5ou know.”
She returned at once to her house. She says that an undertaker, McLoughlin, was there already and said to her that the remains were in his parlor and that Mr. McMahon (another undertaker) and nobody else could get them, and insisted upon her going with him to call upon the claims agent of the defendant company. That she went, but that it was not with any idea of making a compromise, but simply to see about her son’s having a decent funeral; it appearing to her but right that after having killed him the defendant company should bury him. That she did not even know the circumstances of the accident at that time. That the claims agent asked her who she was, and what she was, and where she came from, and, after having received her answers to these questions, got up and went out, and kept her waiting for about two hours until she was nearly worn out, and then came back, and went off again, and then came to her and made an offer of $250, plus the expenses of the funeral. That she was surprised because she was not looking for a settlement.
“Didn’t you say that $250 was not enough? A. I said to him: ‘Well, why not make it $500?’ He said, ‘No, I can’t do it, but if I do you will have to bury him.’ I said, ‘No, you make it $500 with the funeral.’ But he wouldn’t do it at all. So they all got around me and insisted upon it, and they even come to the chair that I was sitting in at the time; I wasn’t even able to sign no papers, and I didn’t know anything at all about it because I was in that state of mind. * * * They worried me nearly to death, and there was nothing else for me to do. Q. Just state to the jury how you came to sign that paper, Mrs. Daley? A. Well, the undertaker seemed to think that I ought to sign the paper; that I had to sign it; that it was something similar that was needed to have my son buried, you understand. Of course, I didn’t have any money of my own at the time, or I certainly wouldn’t have signed anything like this. I would have signed for one dollar if it would have buried my son because that is what I wanted to do, to give him a decent burial. My son was the only one that I thought of, and burying him properly. * * * I had to sign something to have my boy buried. I didn’t know at the time what I was doing; I didn’t care very much, just so I had him buried. * * * The claim agent told me I had to sign or do something to have my son buried. Q. You did affix your mark to the paper, didn’t you? A. *273 Yes, sir; and I could hardly do that. Q. What is that? A. I say, I could hardly do that, because I wanted my son buried, and I had just come from seeing my son, the way he was killed by the railroad company; and what I did, I did it simply so I could bury him. That was all that was in my mind. In fact, they almost told me as much that unless I did that, he wouldn’t be buried; that is the very reason why I did it.”
A friend of plaintiff’s, then the suitor, and later the husband, of her daughter, and the brother of this friend, seem to have followed plaintiff to the office of the claims agent, for they were present when the compromise was made and signed as witnesses to the instrument of compromise. They were not called to testify. The claims agent and the undertaker, and another witness who was present, testified that, while plaintiff was naturally grief stricken and cried at times, she was not so affected as not to be in a mental condition to know and appreciate what she was doing, and that absolutely no pressure or influence of any kind was exercised upon her. And, indeed, plaintiff’s own testimony, as above transcribed, shows that she understood perfectly well what she was doing and was in a mental condition to take care of her interest, since she bargained for a larger amount, and stood out a long time, and yielded in the end only because the claims agent would positively not allow more and she was very anxious to procure for her son a suitable burial.
The testimony of these other witnesses shows that the claims agent had not yet been furnished with the circumstances of the accident when plaintiff came to him, and that he so stated to her, but added that it was the rule of the defendant company to pay $250 in all cases of fatal accident, and that he would offer her that much in full settlement and that plaintiff wanted $500, plus the expenses of the funeral, and would at first accept no less, and that the agent after consulting the president of the company over the telephone. (which took some time) consented to give $500, and that plaintiff concluded to accept that amount, and that one of the blank forms for evidencing such compromises was filled out and signed; plaintiff not signing her name, but making her mark, for the reason that she did not have her spectacles and could not see, and moreover was nervous.
The undertaker testified that he lived two doors from plaintiff, and that, hearing of the death of the young man, he went over to her home to solicit the business of his funeral ; that plaintiff said she did not know what she was going to do as she was a poor woman and did not have any money; and that he then suggested to her to see the railroad people about it and offered to take her there; and that she accepted.
The document of compromise is an acknowledgment on the part of the plaintiff of having received $319 from the defendant company—
“in full compromise, payment, satisfaction, and discharge for ail claims and demand which I have against said companies, their employes or agents, for or on account of any damages, injury, expenses, or loss of whatever kind which have been sustained by me * * * by reason of the fatal accident to my son James W. Daley who was injured by cars Nos. 290 Carondelet line and 349 Henry Clay Ave. line on April 16, 1910, at about 9:15 p. m., corner Girod and Carondelet streets, and died at Charity Hospital about 4 o’clock a. m. April 17, 1910, or for any matter or thing growing out of same.”
On the back of the document is an agreement on the part of the defendant company to pay funeral expenses of the decedent, to the amount of $181, to J. G. Roche & Sons, undertakers.
It being Sunday, the amount, though receipted for, could not be paid, but a cheek for it was to be sent her. As she needed some money that day, however, to take the body to Canton, Miss., the claims agent succeeded in getting together $45 from among the employés in the office and gave this to her in part payment of the $319. A few *275 days later plaintiff repudiated the compromise, and refused to accept the balance of the $319. The defendant company was prevented from paying the undertaker’s bill by plaintiff’s having paid it herself, or some one for her. The defendant made due tender of payment in compliance with the terms of the compromise.
[1] Plaintiff voluntarily entered into this compromise; and it is binding upon her.
Plaintiff makes a very unfavorable impression as a witness. She does not know the name of the railroad in whose employment her son was at the time of his death. She says that her son was all she had to depend on, and at the same time says that she lives at her daughter’s without paying board. That since coming to New Orleans her son had been out of employment up to two weeks before the accident. That previous to that he had lived in Beaumont, Tex., for a year or two, she could not say exactly, but less than three years. That out of his wages as a switchman he would send her from $25 to $30, and sometimes $40.
“Q. You mean a month, I suppose. A. I suppose so; yes, sir. Q. ¡Well, I don’t know, and I have to find out from you. It may have been daily, or weekly, or yearly. I want to know from you. A. Well, it was by the month.”
Asked whether at that time she paid board to her daughter, she answered:
“A. Well, I suppose I did.”
She says she was made to wait two hours by the claims agent, a statement in which she is contradicted by the other witnesses. She says that they worried her nearly to death to prevail upon her to enter into the compromise, another statement in which she is contradicted by.the other witnesses. She says she does not remember whether it was $35 or $40 she got in cash. That sum was a large one for a person in her financial position to receive; hence her not remembering within $10 the exact amount of it is extremely improbable. Elsewhere in her testimony she is asked:
“Q. Did you accept any of that money at that time up in the office of the railways company?”
And she answered:
“A. Only that $45, and that is all. I didn’t accept anything else.”
Thus showing that she remembered perfectly well what amount she had received, and that her previous statement as to want of recollection was not candid. She repeats over and over again that she did not know what she was doing; that she was thinking of nothing else than the burial of her son; and yet in other places she gives such testimony as the following:
“Q. Mrs. Daley, didn’t you first refuse the offer that was made to you of $250?
“A. I did.
“Q. And suggest that you ought to get $500?
“A. Yes, sir; with the funeral out of that. That didn’t leave me no $500, if I had to pay the funeral out of it.
“Q. But there was an offer of $500 out of' which the funeral was to be paid?
“A. I said, ‘Why don’t you make it $500 and you to pay for the funeral?’ That’s what I said to them, you understand. That would have left me $500 clear, if they would have done that, but they wouldn’t do it, and then I didn’t get the $500 from them at all.”
'She denies several times that she consented to the compromise, and then, under stress of cross-examination, testifies as follows:
“Q. As a matter of fact, Mrs. Daley, did you not finally agree with the claim agent of the New Orleans Railways & Light Company to accept the $500; that $500 was to be paid in full settlement of all of your claims, and out of the $500 the funeral expenses of your son were to be paid?
“A. That was their agreement.
“Q. Wasn’t it your agreement as well? I am not talking! about their agreement, but I am talking about something you did yourself. Did you not agree to take that?
“A. No, sir; I agreed to $500. I said, ‘Why not make it $500, and you throw in the funeral?’ But they wouldn’t do anything of the kind.
“Q. They wouldn’t do that?
“A. No, sir.
“Q. Then did you not finally agree to accept the $500, out of which the funeral expenses—
*277 “A. Yes, sir; but they didn’t give me the $500, you understand. They took the funeral out of it.
“Q. That is what I want to get at, Madam. Did you not finally agree that the funeral expenses should be paid out of the $500, and you to get the balance?
“A. Well, I did not.
“Q. Didn’t you agiee to that in the presence of these gentlemen who were there?
“A. Yes, sir; in the presence of these gentlemen there, and I put the letter down there, but I didn’t agree to it all.
“Q. You put a letter to it, but you didn’t agree to it?
“A. No, sir; I said to them. ‘Why won’t you give me $500 and the funeral?’ They wouldn’t do anything of the kind. So they agreed to give me the $500, and to pay Mr. MeLoughlin $180, but that didn’t leave me $500, if they were going to take all of that out for Mr. MeLoughlin.
“Q. Naturally it did not, but I say, didn’t you agree to settle for the sum of $500, out of which the railroad company was to pay the funeral expenses of Mr. Daley, amounting to the sum of $181—
“A. No, sir.
“Q. —leaving you the sum of $319?
“A. No, sir.
“Q. You say ‘No’?
“A. No, sir; that wasn’t it.
“Q. You are sure that was not the agreement?
“A. That .was not the agreement at all; no, sir; because I wanted $500, but they wouldn’t agree to it, they wanted the funeral expenses to come out of it, but I didn’t want it that way at all.
“Q. But didn’t you finally make an agreement just as I have stated it here at least three times?
“A. No, sir.
“Q. You did not?
“A. No, sir; I did not.
“Q. Are you positive of that, Mrs. Daley?
“A. Yes, sir; I am positive of it. '
“Q. And you can’t be mistaken about it?
“A. No, sir; because you see it was this way: I-Ie comes in and offers me $250, and I said, ‘Why not make it $500, with the funeral?’ But they wouldn’t do it; they wouldn’t do it. Then he went through some kind of paper form, but I never accepted the $500, because they didn’t give it to me, you understand, and I didn’.t know anything about it.
“Q. Mrs. Daley, do you mean to swear under oath, as a witness on that stand, that you did not agree at that time, ’ in the office of claim agent of the new Orleans Railways Company, in the presence of Mr. Nieoll, Mr. Joseph Loughlin, and others, to accept the sum of $500 in full settlement, out of which the railways company was to pay the funeral bill of your son, amounting to $181, and you to get the balance of $319?
“A. I agreed to it, yes, but I did not accept it.
“Q. That is all I wanted you to say.”
Further on she testified as follows:
“Q. Did you not know, at the time you signed the agreement, that it was an agreement whereby you were accepting this sum of money in full settlement of all of your claims against the New Orleans Railways Company?
“A. Let me tell you, I never thought a thing about anything but my boy’s funeral, his burial; that is' the only thing I thought about.
“Q. Do you mean to tell me that you really did not know—
“A. No, I did not.
“Q. Will you let me get through with my question?
“A. Yes, sir.
“Q. Do you mean to swear positively under oath that you did not know what you were doing at the time you signed that paper and agreed to accept that amount of money in full settlement of your claim against the New Orleans Railways Company?
“A. Well, I was worn out and nearly crazy, and I wanted my son to be buried decently.
“Q. Don’t you know that you did sign such a paper, and don’t you know that that paper was an agreement to compromise your claims against the railways company for the amount set forth in that paper?
“A. I agreed, but that is not the amount. That is not the amount at all, because I wanted $500, and they wanted me to pay the funeral, but that, wasn’t the right thing at all.
“Q. Now, do you mean to swear positively that after discussing, after going over' this matter, and after their refusal to pay the funeral expenses in addition to $500, that you did not agree—
“A. I agreed—
“Q. Let me g-et through.
“A. All right.
“Q. That .you agreed to accept $500, out of which the railroad company was to retain and pay the funeral bill of $181, and you to get the balance of the $319?
“A. I agreed at the time—
“Q. Didn’t you agree to that?
“A. No, sir; you want to know why I agreed?
“Q. I don’t care why you agreed; I simply want to know whether you agreed or not.
“A. Well, I agreed at the time because I wanted my boy to be buried. Why did they come and offer me $250? Why did they — ”
At the termination of her cross-examination a recess was taken; after recess she again testified in chief and was again cross-examined:
“Q. With whom did you talk about this case during the recess of court?
*279 “A. The recess?
“Q. Yes, during the recess, with whom have you talked about the case?
“By Mr. Woodville (attorney for plaintiff):
“We admit that we talked with the witness during the recess.
“A. I haven’t been anywhere else out of here.
“By Mr-. Kernan:
“Q. What is that?
“A. I haven’t talked to anybody.
“Q. You haven’t talked to anybody at all?
“A. No, sir.
“Q. You are positive of that?
“A. Yes, sir.
“Q. That you have talked to nobody at all?
“A. No, sir.
“Q. You can’t be mistaken about that?
“A. No, sir.
“Q. Not a single solitary soul did you speak to about it?
“A. No, sir; nobody at all.
“Q. And of that there cannot be the slightest mistake?
“A. No, sir; no mistake.”
. Her' evident purpose throughout her testimony is to make it appear that she was so distracted by grief that she was out of her mind and did not know what she was doing; and yet she is made to acknowledge repeatedly that everything was fully explained to her and that she understood perfectly well. She seems to think that she will be released from her agreement if she succeeds in showing that her principal motive in consenting was to have money for burying her son, and she keeps repeating that statement even in answer to direct and pointed questions upon other matters. It is needless to say that, if a person freely and advisedly consents, the motive which may have led to the consent becomes immaterial. In Lamp-kins v. Vicksburg, etc., R. Co., 42 La. Ann. 997, 8 South. 530, Davenport v. Dubach Lumber Co., 112 La. 943, 36 South. 812, the court set aside compromises for claims for personal injuries, but the ground in the first of these cases was error and fraud, and in the other was that the plaintiff was in great pain and under the influence of narcotics and not in a condition to know what he was doing when he made the compromise. In other cases of claims for personal injuries, the court enforced the compromise. Johnson v. Shreveport Waterworks Co., 109 La. 268, 33 South. 309; Smith v. Vicksburg, S. & P. Ry. Co., 112 La. 985, 36 South. 826; Russ v. Union Oil Co., 113 La. 196, 36 South. 937.
[2] But the learned counsel for plaintiff contend that a compromise is not complete and is therefore null, unless whatever sum may have been agreed to be paid under it has actually been paid.
Even if that proposition were maintainable, the compromise in the instant case would not be thereby affected, since it is in the shape of a receipt which shows that the sum agreed to be paid was paid; and any oral evidence adduced by plaintiff to show that it has not been paid is met by proof that if it has not been paid it is because plaintiff refused to accept.
A compromise is defined by Civil Code, art. 3071, as being:
“An agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent in the manner they agree on.”
The idea that parties could not adjust their differences by an agreement to pay money, but could do so only by the payment of cash, is of course not , to be entertained for a single instant. The Code imposes no such condition, but, on the contrary, expressly says that the parties are free to adjust their differences in whatever manner they “may agree on.”
In Antoine v. Smith, 40 La. Ann. 500, 4 South. 321, the consideration of the compromise was a note.
In Calhoun v. Lane, 39 La. Ann. 594, 2 South. 219, the consideration was a promise or agreement to pay a certain judgment and to make a donation.
In Barron v. Sollibellos, 26 La. Ann. 289, the consideration was a promise to confess judgment at the next term of court.
*281 In Sentell v. Stark, 37 La. Ann. 679, the consideration was that judgment was to be confessed, and thereafter the judgment was to be satisfied by the giving of a mortgage.
In Thornhill v. Bank, 34 La. Ann. 1171, the consideration was mutual agreements to do things in the future.
In Rabun v. Pierson, 23 La. Ann. 696, the consideration was an agreement to pay money in the future.
It is needless to multiply instances where the consideration of compromises has been the doing of something in the future; our reports are full of them.
“The effect of a compromise,” says Mourlon on article 2052, C. N., p. 426, “is to oblige each of the parties to do or to deliver the thing promised to be done or delivered.”
If the consideration of a compromise could not consist of something to be done in the future, article 3075 of the Code would be inoperative. It reads:
“One may add to a transaction the stipulation of a penalty against the party who fails to perform it; and in this case the nonperformance of what has been agreed on gives a right to exact the penalty according to the tenor of the agreement and pursuant to the rules recited in the title: Of Conventional Obligations.”
The court could not have meant to say anything to the contrary in Lampkins v. Railroad Co., 42 La. Ann. 997, 8 South. 530, though we must admit that the court did apparently hold in that case that the compromise was of no effect because a part of the consideration had not been paid in cash but had only been agreed to be paid'in the future. The syllabus of counsel’s brief in the case shows, however, that no such contention was made by counsel, but that the ground of attack on the compromise was fraud.
The judgment appealed from is therefore set aside, and the suit of plaintiff is dismissed at her cost.
SOMMERVILLE, J., takes no part.