96 So.2d 612

George C. HAMMACK, Jr.

v.

The RESOLUTE FIRE INSURANCE
COMPANY.

No. 41236.

June 10, 1957.

Rehearing Denied June 28, 1957.

McIntosh, Hester & Gilfoil, Lake Providence, for plaintiff-appellant.

Pipes & Pipes, Monroe, for defendant-appellee.

McCALEB, Justice.

This is a suit on an automobile collision and comprehensive coverage insurance policy for the full cash value of a Willys-Jeepster automobile which was severely damaged and burned in a collision with another car on October 6, 1950, allegedly resulting in a total loss. Plaintiff, asserting that de-fendant failed to settle his claim within 60 days after it was furnished with proof of loss, also seeks recovery of statutory penalties and attorney fees provided for under R.S. 22:658.

Plaintiff avers in his petition that, shortly after the accident, the adjuster for defendant insurer prevailed upon him to enter into an agreement whereby defendant was to cause the car to be repaired for $980.39, of which he would be responsible for $50 under the deductible clause contained in the insurance policy; that he was fraudulently induced to sign this agreement by the misrepresentations of representatives of defendant insurer; that, in any case, the agreement is not binding as defendant failed to have the car repaired within a reasonable time and that the car has never been placed in the same good working order and condition as it was prior to the accident.

Defendant filed an exception of no cause of action, which was overruled, and pleaded, among other things in its answer, the validity of the alleged settlement with plaintiff for $930.39 which was purportedly paid by draft. After a trial on the merits of the case, the judge sustained the defendant's plea of compromise and settlement notwithstanding his finding that plaintiff was "outmaneuvered and overpersuaded into signing a document or documents that bound him legally although he might not have realized the legal consequences". Plaintiff has appealed.

The litigation arises out of the following state of facts. Plaintiff was the authorized Willys-Jeep automobile dealer in Lake Providence, Louisiana. All of his purchases of new automobiles for subsequent resale were being financed under a floor-financing arrangement made by him with a corporation named Motors Securities Company, Inc. This finance company had a close affiliation with defendant, Resolute Insurance Company, the two companies being operated by the same personnel and out of the same offices in Monroe, Louisiana. Mr. J. Leon Dennis, who was the manager of the finance company, was also the authorized agent of the insurance company and the adjuster for the insurance company, Mr. H. H. McManus, was employed and paid by the finance company. Apparently, whenever the finance company lent money on automobiles, it would, in turn, require the mortgagor to take out a policy of insurance in the defendant company and, on September 10, 1950, when plaintiff purchased a new Jeepster to be used as a demonstrator in his business, the policy covering the car for its full cash value (which was stated in the policy to be $1,530) was issued to him by defendant. This policy contains a loss payable clause running in favor of Motors Security Company, Inc., for any unpaid balance of its mortgage which amounted to $1,495 at the time of the issuance of the policy.[1]

On October 7, 1950 (the day following the accident), plaintiff notified the offices of the insurance and finance companies of the extensive damages sustained by the Jeepster in the collision and the ensuing fire. Before the claims adjuster for defendant company, Mr. McManus, made his investigation on October 18, 1950, plaintiff had independently caused two garage and repair establishments in the Lake Providence area to appraise the extent of the loss. Both of these firms concluded that the Jeepster could not be economically repaired and, consequently, the loss was total. Accordingly, plaintiff took the position that the insurance company should reimburse him for the face amount of the policy less $50, as provided for in the deductible clause. McManus, however, disagreed with plaintiff's claim of total loss and refused to make a settlement until repair shops in Monroe would have an opportunity to appraise the extent of damage to the car. After some discussion, plaintiff consented to release the car to the insurance adjuster so that it could be towed to Monroe, some 90 miles away, to have garages in that area determine whether the damage constituted a total loss. When the car arrived in Monroe, McManus brought it to garages in that city. Those garages were of the opinion that the car could be repaired, one of them estimating the cost of repairs to be $1,080.-23 and the other $980.33. On receipt of

1. Plaintiff paid a total of $448.36, as of February 8, 1951 on the mortgage.

these bids, plaintiff was called on the telephone and requested by McManus to come to Monroe to discuss a settlement of his claim.

Plaintiff and McManus met on November 10, 1950, in the joint offices of the finance company and defendant insurance company to discuss the loss. What transpired at this meeting is disputed. Plaintiff testified that McManus offered two propositions of settlement which were unacceptable to him and that he reluctantly indicated that he would consent to another offer of McManus, under which defendant was to have the car repaired by Mizell Paint & Body Shop of Monroe for the amount of its low bid ($980.33) and that $50 of this amount was to be paid by plaintiff.

On the other hand, the testimony of McManus is that the only proposition offered plaintiff was to pay him $980.33 (less the $50 deductible amount due by plaintiff) being the amount of the bid given by Mizell Paint & Body Shop for repair of the Jeepster.

At any rate, no final agreement was reached at the Monroe meeting. Plaintiff refused to sign the statements of proof of loss or the subrogation agreement or any other forms which McManus requested that he sign but he told McManus that he would take these forms with him to Lake Providence and give the matter more thought before deciding to accept or reject defendant's offer of settlement. He testified that,

despite the two bids of the Monroe garages, he was convinced that the car could not be properly repaired and that defendant should compensate him for a total loss. However, on the next day when plaintiff returned to Lake Providence, he acceded to what he believed to be defendant's position, that it would exercise the option granted it under the policy to have the car repaired at its expense. Accordingly, he signed various forms which had not yet been filled in by McManus and which McManus had directed him to sign in the event he decided to accept defendant's offer to have the car repaired. These forms are entitled "Statement of Loss", "Order to Take Possession of Automobile", "Details of Car Ownership", "Proof of Loss or Damage Agreement" and "Receipt and Subrogation Assignment". Upon affixing his signature, plaintiff dispatched the forms to McManus in Monroe, their transmittal being accompanied by the following letter, which sets forth plaintiff's understanding of the agreement:

"Lake Providence, Louisiana
November 9, 1950.
"Mr. H. H. McManus
Insurance Adjuster
% Motors Securities Co.
Monroe, Louisiana.
"Dear Sir:
"I am enclosing herewith proof of loss in re the damage to my Jeepster Demonstrator, signed as you have suggested.

"I am signing but still feel that you people are squeezing me too hard on this adjustment. This car was my demonstrator and had only a few miles on it. At the time it was wrecked, I could have sold it at a profit but now when I get it back from you, I will suffer considerable loss. I feel that since the car was insured for actual cash value then that means at the time of loss and I should be allowed settlement accordingly. That would have given me enough to settle with Motors Securities Co.

"You are the people (you and Motors Securities) whom I am depending on for financing my operations and insuring my customers. I am giving you all my business that I can and I had certainly hoped that when and if I had a loss that I would be reimbursed the full amount of loss and not have to dig into my scant reserves to pay part of a loss.

"If you can see your way clear I would certainly appreciate your giving me a more liberal settlement. But if not, you may go ahead with repairs.

"Yours truly,

George C. Hammack, Jr."

Although there was no formal acknowledgment by McManus of receipt of the above quoted letter with the enclosed forms, it is evident from the record that the communication reached him in the usual course of the mail for, on or about November 15, 1950, McManus caused the damaged automobile to be delivered to the Mizell Paint & Body Shop in Monroe for repairs. And, on November 22, 1950, J. Leon Dennis, purportedly acting as its authorized agent, drew a draft on defendant insurance company payable to the order of plaintiff and Motor Securities Co., Inc. This draft was not delivered to plaintiff nor was it ever presented to defendant for acceptance. Actually, it was simply deposited in the files of Motors Securities Company, Inc., although, according to the testimony of McManus, plaintiff was informed and understood that the draft would be kept by that company because the amount to be paid on the insurance claim was less than the amount owed by plaintiff on the mortgage. Plaintiff denies that he had any such understanding and stated that he never even knew that the draft had been issued until this suit was filed.

Several weeks after the damaged Jeepster had been delivered by McManus to the Mizell Paint & Body Shop for repairs, plaintiff, not having heard from defendant, made inquiries at the joint offices of defendant and the lienholder respecting the progress of the repair work on the car. Being unable to obtain any information from that source, plaintiff went to Monroe on January 13, 1951 and visited the Mizell shop where he discovered that the repairs on the car had hardly commenced as the necessary parts had not yet been received. Realizing,

then, that, even if the car could be eventually repaired, the work could not be completed within a reasonable time, plaintiff returned to Lake Providence and consulted his attorneys.

On January 15, 1951, plaintiff's counsel made formal demand on defendant for payment of the full value of the automobile. After receiving this demand letter, it appears that defendant made a serious effort to have the garage secure the necessary parts for the car which had not yet been obtained. Nevertheless, the repairs had not been completed on May 8, 1951, when plaintiff instituted this suit.

We do not agree with the district judge that the execution of the various forms signed by plaintiff constituted a valid compromise of plaintiff's rights under the insurance policy within the meaning of Article 3071 of the Civil Code.[2] And we further find no merit in the claim of defendant's counsel that plaintiff, by bringing suit on the policy, is attempting indirectly to avoid the settlement of the parties, which is not permissible under our jurisprudence.

■ Plaintiff is not making a collateral attack on the purported settlement. On the contrary, he directly assails in his petition the binding effect of the forms he executed in blank, alleging that, if it should be found that the agreement was for a cash settlement, as defendant contends, and not for defendant to cause the car to be repaired (to which he agreed), then the forms were signed by him in error and through fraud and duress practiced by defendant.[3]

■ The forms signed in blank by defendant do not evidence a compromise agreement within the meaning of our law. It is well settled that, in order for a compromise to be legal and enforceable, it must be unambiguous, perfect and complete in itself so that nothing is left for ascertainment by parol proof. Lampkins v. Vicksburg, S. & P. R. Co., 42 La.Ann. 997, 8 So. 530; Francois v. Maison Blanche Realty Co., 134 La. 215, 63 So. 880 and Misuraca v. Metropolitan Life Ins. Co., 199 La. 867, 7 So.2d 167.

2. It provides: "A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.

"This contract must be reduced into writing."

3. Moreover, even if the allegations of the petition should be regarded as a collateral attack on the so-called compromise, this circumstance would not entitle defendant to have this suit dismissed and plaintiff relegated to a direct action for annulment before seeking recovery under the policy. See Russ v. Union Oil Co., 113 La. 196, 36 So. 937; Hindelang v. Collord Motors, 200 La. 569, 8 So.2d 600 and Chapin v. Federal Transp. Co., La.App., 70 So.2d 189.

The only forms signed by plaintiff in this case which could possibly relate to a settlement of his claim are those entitled "Proof of Loss or Damage Agreement" and "Receipt and Subrogation Assignment". The first of these documents contains a statement of the assured that he agrees that his loss amounts to $980.33, less $50 deductible, it being set forth that the sole purpose of the instrument is to fix the total amount for which claim is made and it is specifically provided therein that the insurance company is not committed to liability or to pay any such amount on said claim. In other words, it is nothing more than a one-sided commitment on the part of the assured which is of no binding effect on the company. It is not complete in itself and, therefore, is not a compromise. Compare Misuraca v. Metropolitan Life Ins. Co., supra.

The other form, styled "Receipt and Subrogation Assignment", is exactly what it purports to be. However, it was not binding in this case as plaintiff had received nothing from the defendant at the time he executed it and, therefore, subrogated nothing.[4] The best that can be said is that the validity of this release and subrogation was conditioned on defendant's ability to have the car repaired and restored to its former good condition. Indeed, as we have stated above, the true agreement, so far as plaintiff was concerned, was that contained in his letter of November 9, 1956, in which he protested defendant's adjustment of the loss but, being dependent upon Motors Securities to finance his operations, nevertheless acceded to defendant's position, concluding "You may go ahead with repairs". And this, we believe, is what defendant, through its adjuster, McManus, undertook to do[5] and failed to do within a reasonable time.

Plaintiff has at all times contended that the car was a total loss and we think the evidence establishes the correctness of his position. At least it is clear that, if it be conceded that the car could have been restored to its former condition, it was not feasible to do so within a reasonable time, possibly because of the inability of defendant's agent, Mizell Paint & Body Shop, to secure the parts indispensable to making the repairs. The record shows that it took Mizell Paint & Body Shop over ten months

---

4. Of course, defendant contends that plaintiff received credit for the $930.33 when the draft made payable to plaintiff and the lienholder was delivered to the lienholder. However, we find that no real delivery was made. We do not think that plaintiff had any knowledge of the execution of this draft and the asserted delivery, which consisted of merely transferring the draft from one file to another in the same office, seems fictitious to say the least.

5. The policy provides that the insurer is afforded three options in settling the loss, (1) pay actual cash of the loss or damage; (2) repair the automobile or cause it to be repaired, or (3) replace it with another of like kind and quality.

to complete the work and it was not until August of 1951 that defendant made a tender of the car, which plaintiff justifiably refused. It should have been perfectly evident to defendant, long before suit was filed, that its agent was either dilatory or could not do the work with dispatch. As early as January 13, 1951, plaintiff investigated and, on discovering that the repairs on the car had not even been commenced, consulted his attorney, who notified defendant of this fact and made demand for payment of the full value of the car on January 15, 1951. Yet defendant did nothing thereafter to effectually remedy the situation and, as we have above stated, repairs had not been completed on May 8, 1951, when this suit was filed.

We think that the foregoing circumstances warrant the conclusion that the conduct of defendant's agent in handling the adjustment of this loss has been arbitrary and that defendant's failure to pay or to restore the car to its previous condition within a reasonable time was clearly without justification. Therefore, it should be assessed with the 25% penalty and reasonable attorney's fees provided for by R.S. 22:658.

Plaintiff is claiming the full retail value of the Jeepster, approximately $1,800, and he offered evidence showing that a prospective purchaser tentatively agreed to buy the car for such amount on the day prior to the accident. However,

since the actual cost of the car is stated in the policy to be $1,530, this, in our opinion, is the limit of defendant's liability, less $50 deductible, or $1,480, plus the 25% penalty, amounting to $370. In addition, we think that plaintiff's demand for $400 attorney's fees is reasonable and allowance will be made therefor.

The judgment appealed from is reversed and it is ordered that there be judgment herein in favor of plaintiff and against defendant for $1,480, with legal interest thereon from judicial demand until paid, and all costs of court, plus the statutory penalty of $370 and $400 attorney's fees.