(68 South. 100)

No. 20039.

McCOY v. LOUISIANA & N. W. R. CO.

(March 22, 1915. Rehearing Denied April 12, 1915.)

*(Syllabus by Editorial Staff.)*

CARRIERS ⬉346—CONTRIBUTORY NEGLIGENCE OF PASSENGER — SUFFICIENCY OF EVIDENCE.

In an action for injuries to a passenger in a collision, where the defense was that the passenger was on the car platform at the time, and therefore contributorily negligent, evidence *held* insufficient to support a judgment for the plaintiff.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1401; Dec. Dig. ⬉346.]

Appeal from Third Judicial District Court, Parish of Bienville; W. U. Richardson, Judge ad hoc.

Action by James M. McCoy against the Louisiana & Northwest Railroad Company. Judgment for the plaintiff, and defendant appeals. Reversed, and suit dismissed.

John A. Richardson, of Homer, and J. C. Theus, of Monroe, for appellant. Wimberly & Reeves and Roberts & Goff, all of Arcadia (Breazeale & Breazeale, of Natchitoches, of counsel), for appellee.

PROVOSTY, J. Plaintiff was injured while he was a passenger on one of the trains of the defendant company. The train was going north. It had stopped at Chestnut Station, and the conductor had gotten off and gone to the railroad office at the station. It had then proceeded some 4,000 feet beyond the station and stopped to await the coming of another train. It was composed of a locomotive, 22 freight cars, and one combination coach. This coach was at one end of the train, and the locomotive at the other, with, of course, the 22 freight cars between. The locomotive was not pulling the train, but was pushing it. It was at the south end of the train, with its head towards the train, pushing it north. Its tender, of course, was behind it, or south of it. Three loaded coal cars were turned loose south of Chestnut Station on the track on which this train stood, and as the grade was downward towards the north, or in the direction of the train, these coal cars, instead of stopping, after having been thus turned loose, continued to move towards the stationary train, and with accelerating speed. The conductor, seeing this and fearing a collision, boarded them as they passed Chestnut Station, and endeavored with the aid of the brakeman and another man who were upon them to stop them, but, finding that he could not, he gave the alarm by loud cries to the engineer on the stationary train, and the latter immediately put his train in motion to try and escape the collision or, at any rate, to diminish its force. It is estimated that the two trains were moving, respectively, at the rate of 12 and 4 miles an hour when the collision came. The impact had the effect of stopping the train by putting on the air brakes, and of stopping also the three coal cars. No damage was done to any of the cars or to the coach, and very little to the locomotive. Its pilot bar was bent, and the studbolt that fastens or braces the cab to this brace was broken.

"What size is that? A. About five-eighths of an inch diameter, the best I can remember. Q. And but for that you could have used that engine and gone in under her own steam? A. Yes, sir; I think so."

The tender suffered most. The timber back of it was shattered, and it was pushed up on the apron of the cab of the engine, and one of its trucks was derailed. The nearest truck of the car next to the locomotive also was derailed.

The passenger part of the combination coach was the end furthest from the engine; it constituted the north end of the train. Plaintiff was in it. Another passenger, a Mr. Lewis, was in the baggage part. They were the sole passengers. A brakeman, Dave Jones, was on the ground on the side of the

train. Plaintiff says that when the collision occurred he was standing in the aisle approximately opposite the first cross-seat, there being a lengthwise seat between this first cross-seat and the end of the car. He says:

"When I realized there was something happening, I made a grab at a seat and missed it, and the next moment I butted in with my head against the door facing of the rear end of the coach. Just about that time things were happening so fast it was impossible to describe it. Then there was another bump; seemed like the coach reared up, bucked up some way, and jerked a second time. I tried to hold with my right hand, and seemed I lost consciousness. I could not say how long, some time afterwards—it was like a dream—I remember of trying to get my handkerchief out of my pocket; my nose was bleeding, and my mouth hurting considerably about that time; but the first clear moment I had, something that refreshed my mind, some one hollered that we had had the hell of a wreck. I was holding to the iron rod of the rear of the train on the west side that holds the step; the party was forward, not riding on there; he came and got hold of me and asked if I was hurt. I told him I did not know; I thought pretty bad; and he tried to help me. He was not stout enough, and I fell down alongside of the end of the ties."

The "party" who thus came to the assistance of plaintiff was a Mr. Lewis, the other passenger on the train. This other passenger says:

"I heard a loud hollering at the front, and I got up and went to the baggage car door to see about it. At that time the train was moving, started up again, when I got up. Q. What did you do when you went to that door? A. Pressed my hand against the door just like the man in this picture. Q. Do you know what Mr. McCoy did? A. No, sir; the first time I noticed he was standing on the back step. Q. Where were you when you noticed this? A. In the baggage car door. Q. Was anything said or passed between you? A. No; nothing that I remember particularly, a word or two, something about the collision. Q. State. A. I don't remember what it was. Q. Did you continue to look at him? A. No, sir; looked back up the track towards the north. Q. Now when you looked back up the track what occurred, if anything? A. There was a pretty hard jolt, hard coupling. Q. Well, what effect did it have on you? A. Not any. Q. Did it knock your hand looser, anything of that kind? A. No, sir. Q. When was the next time you saw Mr. McCoy? A. He was getting up at the rear end of the coach. Q. Whereabouts? A. Pulling up on the dump-

like. Q. Did you stay in there all the time? A. No, sir, I went out the back end of the coach, the same he was coming up on. Q. What did you do then? A. Standing near the coach at the step. Q. What was said? A. He asked me if I had any medicine, and I said no. Asked what was the matter, he complained of his rib or side; said he had fell. * * * There was a darkey coming down the track, and I got him to go and get a doctor."

That darkey was the brakeman, Jones. He says that, as he was going up the track to flag the train which turned the coal cars loose, he saw plaintiff on the step at the back end of the coach, and Mr. Lewis in the door of the baggage car; that when he saw the coal cars coming he ran back to his engine.

Plaintiff himself testified that he went out on the platform of the coach and saw Jones pass going south towards the engine, but that it was the front or south platform he went on, the platform of the baggage end of the coach, and not that of the back, or north or passenger end, where Lewis and Jones place him, and where he was found after the collision, and that when the collision took place, he had already gone back into the coach.

The defense in the case is that the plaintiff was on the step of the platform when the collision occurred, and that his being there instead of being seated inside of the coach, was contributory negligence on his part which bars recovery; and the case turns upon whether plaintiff was, as he says, inside, or was thus on the platform or step.

Plaintiff was a fleshy, heavy man of 55 years. If he was on the platform of the car, and especially on the step, leaning out, as Lewis was doing, to try to ascertain what the cries they were hearing were about, his having been found after the collision on the ground near the step of the car is accounted for. But if he was inside of the coach, as he says he was, it is difficult, if not impossible, to account for his being thus found on the ground outside. He himself does not account for this change in position, but says that it occurred while he was unconscious.

The conductor of the train testifies as follows:

"Once since the night that it happened I was at Bienville and saw Mr. McCoy and asked him how he was getting along. I was glad to see him up, and he told me that he was able to be up and around. Mr. McCoy told me that he heard a noise, hollering towards the engine and an unusual noise, and he stepped out to see if he could see or hear what it was, just as he went to look. Q. Say where he stepped? A. Out on the platform to the end of the coach to see if he could distinguish what was the matter, and as he looked out the jar came, and said he did not remember any more."

The plaintiff is a good deal discredited as a witness. The permanent injury he complains of is to his ankle. He testified as follows:

"Q. What was the injury to the ankle so far as your use of it and the pain you suffered is concerned? A. I have never been able to place that foot clearly on the floor without the use of a crutch; it has a burning, stinging, sensation, and hurts all the while. I lay with it propped up in bed every night. Q. What is the present condition of that ankle and that leg? A. There is a pain in there that is excruciating all the while, and it is inflamed, and it gives me trouble every minute, sleeping or awake; it is just the same old ache there. Q. Is it possible for you to walk at all without the use of crutches? A. Not without one. The second crutch is more of a balance, and it would be impossible to go without one. Q. Can you put the weight of your body on the left ankle and knee? A. I cannot."

A Mr. Weaver testified that he saw plaintiff walking carrying his crutch horizontally under his arm, who, on becoming aware that he was being observed, put down the crutch and began using it.

Another witness, a Mr. Hudson, testified that he frequently saw plaintiff walk 15 to 20 feet in his, plaintiff's store without his crutch, and has seen him walk on his cotton platform without his crutch, and has seen him even walk as far as 50 yards carrying his crutch horizontally under his arm.

"Q. What would he do; would he see you and know when he did not use them, or would he change when anybody was near to see? A. Yes, sir; it was very noticeable."

Plaintiff attributes the malady of his ankle entirely to this accident. A Mr. McDonald testified that he had boarded with plaintiff before the accident, and that—

"he never laced his shoe above the eyelets all the time that I was there. His feet were swollen badly most of the time, and he complained greatly about them, and a number of nights while I was there he got up complaining and stating that his feet and ankle hurt so he could not sleep."

This witness, however, is shown on cross-examination to have been unfriendly to plaintiff, and his testimony must therefore be taken only for whatever it may be worth.

The witness Lewis is sought to be discredited by a Mr. Hennegen, who says that he went to where Lewis was assisting the plaintiff after the accident, and that Lewis said: "We have had a hell of a collision here and have killed one man." Lewis denies that he made any such statement, and also denies having had with Hennegen another conversation to which Hennegen testifies.

There is no reason why Lewis should have made either one of the statements here attributed to him; for, while there had been a collision, it had not only not been a "hell" of a one, but had not been a serious one; and Lewis could not have supposed that plaintiff had been killed, for just at that moment, as testified to by plaintiff, he had asked plaintiff whether he was hurt, and plaintiff had answered: "I told him I did not know; I thought pretty bad." On the stand he describes the effect of the collision as a pretty hard jolt, hard coupling.

The engineer says:

"It did not seem to be a very heavy lick. I do not think there could have been much shock to the rear cars."

He adds:

"I should think in a collision that the cars nearest the impact arrested the shock; and does so on down the line until it is fully arrested. Q. Are there any springs in there, put on the rear end of each car to break the force of the jar?

A. Yes, sir; for the purpose of counteracting the shock in coupling cars."

The president and general manager of the defendant company testifies as follows:

"Q. Mr. Nelson, what springs, if any, are there on all freight cars so as to break the jar when those cars bump together in coupling or otherwise? A. There is a spring from 8 to 12 inches in length placed between two pieces of iron that breaks the force of the jar, and takes the strain off in pulling the train forward."

When it became evident that a collision was inevitable, the engineer jumped off of his engine, and the conductor jumped off the coal cars which he had been endeavoring to stop. This would go to show that they thought the impact was going to be pretty severe, and doubtless the shock was considerable to the engine and to the coal cars, near the point of the impact; but this does not mean that it would be equally severe to the coach, with 23 freight cars intervening.

Lewis testified that before the collision he saw a darkey clearing up some lanterns, and that after the collision there were two lanterns, one on one of the seats in the coach and one in the window, and that they were not broken, and he did not see any of them knocked off. On cross-examination he said he did not know that they were there before the collision; that he saw them there after the collision, when he went into the coach to get a light.

Counsel argue that by this testimony Lewis has shown himself to be unworthy of belief. We do not see why so. We do not find that the witness has contradicted himself, or said anything improbable. Even had he testified that he had seen the lanterns in that position before the collision, and that notwithstanding the shaking of the train they had remained in the same position, his statement would have been improbable, but not necessarily impossible. He was merely a passenger on the train, and an entirely disinterested witness so far as the record shows, and his testimony

136 LA.—32

appears to have been given in a frank and straightforward manner.

The judgment appealed from is set aside, and the suit of plaintiff is dismissed at his cost.