REGAN, Judge.
Plaintiff, Stanley Sambola, a guest passenger in a 1940 Ford Opera.Coupe, owned and operated by Emile Abadie, instituted this suit against the defendant, Public Belt Railroad Commission of the City of New Orleans, in the amount of $70,814 representing damages for personal injuries incurred by plaintiff as the result of a collision between Abadie’s automobile and a diesel locomotive owned by defendant and operated by its employees.
Defendant filed an exception of “vagueness” which was overruled. It then answered and denied that it was guilty of any negligence in :the premises and that the •proximate, cause of the accident was the .gross negligence of Abadie,-the driver of the automobile, in crossing the track in disregard of the warning emanating from defendant’s locomotive and, in the alternative, pleaded the independent contributory negligence of the plaintiff, in that he was in a “better position to see than was the driver, and his failure to see the approaching locomotive and warn the driver * * * bars his recovery.”
The Board of Administrators of the 'Charity Hospital of Louisiana at New Orleans intervened and requested that in the event of judgment in favor of plaintiff, that it have judgment in solido against both defendant and plaintiff for the sum of $435 with attorney’s fees.
The Hartford Accident and Indemnity Company intervened and informed the court that plaintiff had filed a suit against his employer, Lykes Bros. Steamship Company, endeavoring to recover compensation benefits for the loss of his right arm; that intervenor had not paid to plaintiff any compensation benefits or medical expenses, but that should intervenor or its assured be held liable thereof, then, in that event, in-tervenor is entitled to a judgment recognizing its right, by priority, to be reimbursed out of the proceeds of any judgment which may be rendered herein in favor of plaintiff, Stanley Sambola, together with 20% attorney’s fees and costs of this intervention. Several months before judgment was rendered herein, the Hartford Accident & Indemnity 'Company compromised plaintiff’s claim for $4,000.
There was judgment in the court, a qua, in favor of plaintiff, Stanley Sambola, in the sum of $15,000; in favor of intervenor, Hartford Accident & Indemnity Company, in the sum of $4,000 with legal interest from January 24, 1951, 20% attorney’s fees and costs of its intervention, to be paid, with priority, out of the $15,000 awarded Stanley Sambola; there was further judgment-in favor of the Board of Administrators of the Charity Hospital of Louisiana at New Orleans, in the/sum of $435 with legal interest from judicial demand and 10% attorney’s -fees. From that judgment the defendant has prosecuted this appeal. Plaintiff has answered the appeal requesting that the judgment be increased to the sum of $30,000.
*269 The record reveals that on the morning of June 10,1950, at about .3:30 a. m., Emile Abadie, Hubert D. Howell, Rudolph Mir-andona and Stanley Sambola, all of whom with the exception of Howell, a United States Customs Inspector, were employed by Lykes Bros. Steamship Company, terminated their workday at the Galvez Street Wharf, which is located near the Industrial Canal in New Orleans, Louisiana. Abadie offered plaintiff, Howell and Mirandona “a ride” which they accepted. Plaintiff occupied the right front seat, Mirandona the left rear seat behind the driver and Howell the right rear seat. Shortly after leaving the Galvez .Street Wharf, Abadie drove into -N. Claiborne Avenue and continued in the direction of Poland Street, crossing the intersections of Japónica and Kentucky Streets. The headlights on Abadie’s automobile were lighted and he was traveling at a speed of between twelve and fifteen miles per hour. When he and the occupants of his car endeavored to cross a railroad spur track which intersects N. Claiborne Avenue between Kentucky and Poland Streets, Abadie’s automobile particularly the right door thereof was struck by a Public Belt Railroad diesel switch engine, the cab of which was occupied by its crew, consisting of Ernest Bourgeois, Lawrence Williams, Louis Caravella, Robert Satter and Clarence Dillard. The engine was moving at a speed of between six and eight miles per hour from the northwest to the southeast or from the direction of Poland Street towards Kentucky Street. In consequence of the collision plaintiff’s right arm, which had rested on the sill of the right door was severed above the elbow.
The record reflects .-that this intersection is what has been colloquially designated in our jurisprudence as “blind” or, at least, “semi blind”, and that the railroad had erected on either side of its tracks the usual “X” or crossbuck warning sign of the “reflector type”. A street light existed in Poland and Claiborne Streets approximately 140 feet from the scene of the accident and another was located in Kentucky and Claiborne Streets, which was about -120 feet removed from the accident.
Plaintiff. contends that the employees of the defendant were negligent in the following respects:
“Defendantls engine approached and attempted to cross the N.. Qaiborne intersection” with (a) “headlight extinguished”; (b) “Bell silent”; (c) Whistle or horn silent”; (d) “With no lookout, watchman or flagman” present at the intersection; and finally (e) That the member of the crew occupying “the left.side of the cab was not keeping a proper lookout and failed to take the proper steps to avoid the accident after he sighted the automobile.”
Defendant, in opposition thereto, maim tains that-the headlight On the diesel engine was lighted, its bell ringing and that the member of the crew occupying the left side of the cab was keeping a proper lookout and that the employees of defendant did everything possible to avoid the accident; that under the circumstances it was not necessary for the engine’s horn or whistle to be blown or that a'lookout, watchman or flagman.be present at the time the engine crossed this intersection.. Defendant insists that its employees were not guilty of any negligence in the premises and that the - proximate cause of the accident was the gross negligence of Abadie, the driver of the automobile, in crossing the track in disregard of the .warning enumerated here-inabove,. and, in the alternative, that plaintiff was occupying a better position to see than was the driver and his failure to see the approaching locomotive and warn the driver was independent contributory negligence which bars his recovery.
• Plaintiff, Abadie, Howell and Mirandona, occupants of the automobile, all testified in substantial agreement and to the effect that the locomotive’s headlight was not lighted; that no bell or whistle was ringing or blowing and that no lookout in the nature of a watchman or flagman was present to warn them of the approach of the- engine; that it was several minutes after the actual occurrence of the accident before the engine’s headlight was, in fact, lighted.
The windows of the automobile were open and the hearing of at least three of the occupants was normal; there is evi *270 dence in the record to the effect that the hearing’ of Abadie, the driver, was slightly-impaired.
Alphonse J. . Reed, Eugene Smith and Jerome Biehiemy, also employees of Lykes Bros; Steamship Company, arrived in their automobile at the situs of the accident approximately two or three minutes after its occurrence. They too testified that when they arrived the headlight on the engine was not lighted, but that it was only switched on several minutes after their arrival.
The ¡five members of the train crew, all of whom were in the cab of the engine at the time of the collision, testified positively that the headlight was lighted brightly, that the bell had been continuously ringing and that the train was moving at a speed of between six and eight miles per hour. Williams, who bore fhe title of engineer, but who, on this occasion, was acting as fireman and seated on the left side of the cab, testified that he observed the automobile travelling between twenty-five and thirty miles per hour when it was about forty feet from the crossing and the front of the engine was about at the curve where the street ends; that he yelled “hold it, hold it, hold it” to Bourgeois, a fireman who was acting as engineer and seated on the right side of the cab and that the locomotive came to a stop in the center of the intersection and which was within approximately fifteen feet after the signal was given.
The five crew members also agreed that the Public Belt Railroad Commission had received numerous requests both from the residents of this neighborhood and the police of the Fifth Precinct Station, relative to minimizing the use of the train’s whistle and bright lights during switching operations occurring at night, which obviously disturbed the equanimity of those people living in this area. However, they contradicted each other and evasively testified on the significant point of whether or not they yielded in deference to these complaints on the morning of the accident.
The primary question posed for our consideration is one of fact and that is whether defendant’s locomotive endeavored to cross the intersection of N. Claiborne between Poland and Kentucky Streets with its headlight turned off and its bell and whistle silent.
The trial judge, who- had an opportunity to hear, observe the demeanor and then evaluate the testimony of the witnesses, resolved the answer to this question in the affirmative and our careful examination of the evidence 'contained in the record fails to disclose any error in his conclusion.
The testimony of plaintiff and his six witnesses was honest, forthright and unequivocal and clearly reveals that when, defendant’s locomotive approached and endeavored to cross N. Claiborne Avenue its headlight was not lighted nor was its bell ringing.
It is significant to observe in connection with, and in addition to the foregoing conclusion of negligence, that the defendant’s operating rules, which are a part of the evidence, requiring them to sound the engine’s whistle or horn when travefsing a crossing such as the one involved herein. Defendant’s crew admitted that neither the horn or whistle was sounded. The general manager of the Public Belt Railroad testified that this rule had been verbally modified to the extent that the whistle did not have to be blown in that area, however, the crew members themselves testified that the yardmaster had requested that they make as little noise as possible at night because of the complaints which we have enumerated hereinabove, but they were not told that they should stop blowing the whistle at any particular crossing. This is confirmed by Williams who testified in response to the question “Did you get orders not to blow the whistle or horn?” “I can’t say I got orders to that effect, but I was requested to refrain from making noise whenever possible.” It will be recalled that it was Williams, who was afforded a view of the approaching automobile through the left window of the cab and who testified that when he first observed the automobile the front of the engine was about at the curve where the street ends and the automobile was approximately forty feet *271 away from the crossing and since he was seated in the left of the cab, he was not in a position to blow the whistle. Bourgeois, the occupant of the right side of the cab and who was operating the engine, was the only member of the crew who had access to the brakes and the whistle and he did not blow the whistle because he could not see east on North Claiborne (the direction from which the automobile emanated) until he had gotten into the street.
We are of the opinion that had the crew exercised precaution commensurate with existing circumstances, to-wit: at this “blind” or “semi blind” corner, especially at night, the operator of the engine would have sounded his whistle or horn since he was not in a position to observe an automobile approaching from the east on N. Claiborne Avenue. Indeed, the company’s rulel03~C provides “that when trains or engines, with or without cars, meet in vicinity of highway or street crossings at grade, they must proceed with caution, and if necessary to avoid accident, stop.” Rule' 103-A further provides that “when switching or shoving cars over public crossings not protected by gates, a flagman, a member of crew must protect the crossing from a point on the ground at the crossing and all movements over crossing must be made only on his signal.”
In addition to the foregoing operating rules, City Ordinance No. 14,114 C.C.S., which also forms' a part of the evidence, provides that “an automatic signal light, of an approved design, shall be kept in constant operation at all times, provided that at crossings where watchmen are stationed continuously by any such railroad company, it shall not be necessary to provide such automatic signal light.”
The violation of an ordinance is of no importance in the final analysis of a tort action unless the.r£ is a causal connection between its violation and the resulting accident. In the instant case there is a definite and clear-cüt causal connection between the violation of the aforementioned ordinance and the resulting accident.
Defendant insists in derogation thereof that the Public Belt Railroad Commission is a constitutional body and not subject to a safety regulation enacted by the City Council and, in support of this conclusion, points to Article XIV, Section 26 of the Constitution which provides “ * * * The control, operation, management and development of the Public Belt Railroad system shall be exclusively vested in said commission * *
The Commission Council of the City of New Orleans enacted this ordinance in the interest of the general public’s safety and welfare and it obviously applies to any company which operates a railroad within the area encompassing the City of New Orleans. Article XIV, Section 26 of the Constitution simply means that the City Council shall not nor shall any other railroad or officer thereof interfere with the operation,. control, management and development of the Public Belt Railroad, but it does not attempt to limit, restrict or nullify the application of ordinances enacted in behalf of the general public’s safety and welfare by the City of New Orleans to the Public Belt Railroad.
Defendant insists that the proximate cause of the accident was the gross negligence of Abadie, the driver of the automobile in which plaintiff was a guest passenger, in crossing the tracks in disregard o„f the warning signals emanating from the approaching locomotive. Having concluded that there was negligence on the part of those operating the engine and'that this negligence had causal connection with the accident, we find it unnecessary to discuss the charges of negligence against Abadie, since it is obvious that the judgment in favor of plaintiff was correct unless he, himself, was guilty" of independent negligence.
Defendant has pleaded the independent contributory negligence of plaintiff in bar to his recovery. It is'too ■well established to require the citation of authority that defendant bears the burden of establishing contributory negligence on the part of plaintiff by a preponderance of *272 evidence. This the defendant has failed to do. Ordinarily a guest may' rely on the driver to keep a proper lookout, unless the danger is obvious or is known to- the guest and is apparently not known to the driver. The guest 'cannot be expected to maintain the same careful lookout as the driver and, therefore, the guest, of necessity, must entrust the greater part of his safety to the driver. In other words two circumstances must concur in order to constitute negligence on the part of a guest passenger — -(a) an opportunity to be apprised of the danger and (b) the further opportunity to warn the driver. A simple analysis of the’ circumstances in this case conclusively shows that plaintiff had no opportunity to be apprised of the danger since he received no warning of the locomotive’s approach and, therefore, he had no opportunity to warn the driver-. If plaintiff had been apprised of the impending collision it is obvious that, in obedience to the natural law of self preservation, he would have instinctively removed or withdrawn his arm from the source of danger, the right window sill of the automobile of which he was an occupant. This is proof per se, independent - of any witness’ testimony that plaintiff was not apprised of the fact that his arm was about to be severed from his body.
It is also well settled in our jurisprudence that a guest passenger is not negligent in allowing his arm to protrude from the window of a vehicle.
In Hadrick v. Burbank Cooperage Company, La.App., 177 So. 831, 833, we said: “There can be no doubt, however, that it is not negligence for a passenger to -permit a portion of an arm or a hand to extend only a few inches beyond the side of the vehicle in-which .the passenger is riding.”
The Charity Hospital’s records reveal that -plaintiff was sixty years of age and had enjoyed physical good health prior and subsequent to the accident with the exception of the loss of his right, arm three inches above the élbów joint, leaving a remaining stump eleven inches long which has resulted in pain and suffering; however, the medical testimony indicates that this pain may be alleviated by the passage of time. Immediately after the accident he was operated upon, and remained in the hospital for eighteen days. He received treatment from the clinic until November, 1950, when the remaining portion of his arm required additional surgery. At the time of the trial he had not been discharged from the clinic and there is testimony indicating that he would have to continue receiving treatment for quite some time.
The record further reflects that plaintiff will not in the future possess the capacity to fulfill the duties of a “clerk in charge”, the position he occupied prior to the accident, a prime requisite of which is “hand writing” and “climbing of ladders.” By virtue of 'the- loss of. his right hand and forearm (plaintiff was right-handed) he is thus deprived of his ability to write which, per se, has worked irreparable and permanent injury upon his future earning power. His earnings for 1947,. 1948, 1949 and from January 1, to June 10, 1950, reflects that he averaged approximately $5,300 per year. The American Experience Table of Mortality reveals that plaintiff, at the time of his injury, had a life expectancy of approximately fourteen and one half years.
We • are of the opinion that the $15,000 awarded plaintiff by the court, a qua, is inadequate considering all of the circumstances and the present devaluation of the dollar and, in, our opinion, it should be increased to the sum of $20,000 which we believe to be adequate only in so far as money may make it so.
For the reasons assigned the judgment appealed from is amended by increasing the amount awarded plaintiff from $15;000 to $20,000. In all other" respects the judgment appealed from is affirmed. "
Amended , and affirmed.