79 So.2d 345 (1955)
Marion A. BENSON, Plaintiff-Appellee,
v.
The METROPOLITAN CASUALTY INSURANCE COMPANY OF NEW YORK and Firemen's Insurance Company of Newark, New Jersey, Defendants-Appellants.
No. 8295.
Court of Appeal of Louisiana, Second Circuit.
March 22, 1955.
Rehearing Denied April 14, 1955.
Writ of Certiorari Denied May 23, 1955.
*347 Jackson, Mayer & Kennedy, Shreveport, for appellants.
Bolin, Lowe & Fish, Minden, for appellee.
AYRES, Judge.
This action in tort was instituted by the plaintiff, Marion A. Benson, a young man of the age of 25 years, against the defendants Metropolitan Casualty Insurance Company of New York and Firemen's Insurance Company of Newark, New Jersey, as the insurers of an automobile owned by M. T. Browning, seeking to recover the sum of $10,000 as the result of personal injuries sustained in an accident occurring August 13, 1949, on the Bossier-City Plain Dealing paved highway, a few miles south of Plain Dealing and while a guest of one Ted Tyler, the driver of said automobile and the grandson of the said M. T. Browning, with whose consent and permission said car was being operated at the time.
From a judgment in plaintiff's favor, as prayed for, the defendant, Metropolitan Casualty Insurance Company of New York filed an appeal bond perfecting a suspensive and devolutive appeal to this court.
Plaintiff charged that Ted Tyler was driving and operating said automobile at a fast and reckless rate of speed under the circumstances prevailing at the time, without keeping a proper lookout and without keeping said automobile under control, and in striking one of 3 mules ambling diagonally across the highway, without slowing down, stopping or taking other precautions to avoid the accident.
To plaintiff's demands, defendants tendered the following defenses:
1. That plaintiff's demands had been settled, compromised and adjusted, which transaction and compromise had the force and effect of res adjudicata, which they specially plead in bar of plaintiff's claims;
2. That plaintiff and Ted Tyler were returning from a trip jointly undertaken and for their mutual interest and benefit, on which trip the vehicle was under their joint control and supervision;
3. That it was through no fault or negligence of the driver that the accident occurred;
4. That plaintiff was guilty of negligence, barring his right to recover, in that he was fully aware of the manner in which the vehicle was being driven and made no protest thereto, and in that he failed to keep a proper lookout for his own safety, and that by the use of proper care, he could have and should have observed the presence of the mules upon the highway and should have warned the driver of their presence, and in riding with his arm partially outside the window of the automobile, which purported acts of negligence were alleged to constitute the proximate cause of the accident and the injuries resulting therefrom, or, in the alternative, contributory negligence on the part of the plaintiff, barring his recovery.
A résumé of the facts appears necessary to a proper presentation and discussion of the issues thus raised. The material facts are not disputed. At the time of the occurrence of this accident Benson was living and working in Springhill, Louisiana. On the afternoon of August 13, 1949, a friend of his, Ted Tyler, who had borrowed his grandfather's automobile, invited Benson to accompany him to Shreveport, Louisiana, to a night baseball game. After driving to Shreveport and attending the game, they began their return trip, with Tyler again the driver, with plaintiff seated on the righthand side of the front seat. At the time of the accident, the car was proceeding in a northerly direction on a comparatively straight section of the Bossier City-Plain Dealing highway and, after proceeding over a hill or incline, the driver observed 3 mules ambling from the righthand shoulder towards and across the highway in front of the car. Without slowing down, Tyler swerved the car to the *348 left to avoid striking the mules and then back to the right to prevent a collision with an oncoming car. In the execution of these maneuvers, the car struck one of the mules and this mule struck plaintiff's arm, partially protruding out the window, between the elbow and wrist, producing a comminuted fracture of the right humerus from his elbow to the shoulder and a comminuted fracture of both the radius and ulna of his right arm. After an unsuccessful attempt to secure medical assistance in Plain Dealing, plaintiff and Tyler proceeded towards Springhill and, in the course of the trip, they were delayed by a flat tire, after the occurrence of which a passerby took plaintiff to Gray's Clinic and Hospital in Springhill, where he arrived about 2:00 A.M.
Dr. Gray administered first aid treatment and sedatives and narcotic drugs to relieve pain. Plaintiff remained in the clinic under the influence of sedatives until Wednesday morning, when he was transported by plane to a hospital in Meridian, Mississippi, and was admitted to the Rush Memorial Hospital, where he remained for a period of 4 weeks, after which he was treated almost daily for several months. He again returned to that hospital, where he was again placed under anesthesia, because pins placed in his arm in setting the fractures were protruding, causing pain. The pins were adjusted in that operation.
The record discloses the expenditure of an amount exceeding $1,700 for medical treatment and professional care.
About 2:00 P.M. of August 16, 1949, one R. D. Coats, an insurance adjuster employed by defendants to make an investigation of this case, called at the Gray Clinic and Hospital in Springhill. Coats ascertained from the nurse in charge that it was permissible to talk to plaintiff and that he was not under the influence of opiates. In this connection we note that the hospital chart showed and the nurse admitted in her testimony that only 30 minutes before she had given plaintiff an oral dosage of nembutal. The adjuster visited plaintiff, obtained a statement as to his version of the accident, after which he told plaintiff there was no liability on the part of the defendants for the personal injuries sustained by him but that the $1,000 maximum hospital and medical expense, as provided in the policy, would be paid regardless of legal liability. Whereupon he then offered $100 in full settlement of any and all other claims for his injuries. Plaintiff's signature to a release was then obtained, wherein he acknowledged receipt of the amount, which, however, he did not get at that time due to the adjuster's lack of authority to draw drafts on defendants. However, a draft was mailed to plaintiff August 31, 1949, which he neither endorsed nor cashed. The draft was not immediately returned, but plaintiff either kept it in his possession or delivered it to his attorneys, who, however, returned it in May, 1950, prior to the institution of this suit. Defendants made no further attempts, through tender of the money or otherwise, before or during the trial, to pay said sum.
Dr. Gray testified that plaintiff was, at all times while in his clinic, under the influence of pain-relieving drugs and that on the day the release was signed plaintiff was given at 1:00 o'clock P.M. nembutal and aspirin and a half grain of codeine for relief of pain. After having taken these sedatives, Dr. Gray said that plaintiff was in "a kind of foggy sort of condition", and continued "but we did have to give these sedatives regularly to this man for his pain and if it relieved his pain it naturally affected the mind so that the pain was not relayed up to his brain. That is what causes pain, is the nerve relaying it to your brain that there is something wrong in your arm, so you shut off this impulse," and that "It gives a man a feeling of well-being, a feeling of euphoriaeverybody is his friend and he just feels fine"; and that plaintiff did not have the power to think or reason things out. Dr. Gray was corroborated by the testimony of Dr. Garrett that the amount of sedatives given plaintiff was such as to seriously impair his mental faculties and power of reasoning.
With this background of the facts before us, we will now revert to a discussion *349 of the principal issues and defenses urged by defendants in the order enumerated hereinabove. The first relates to the compromise settlement. It is to be observed that plaintiff made no reference to this purported settlement in his petition and, consequently, there was no demand or prayer for its rescission.
The law of this State is, so states the Code, that voluntary compromise agreements, lawfully consummated, have the force of a definitive judgment. LSA-C.C. Art. 3078 provides:
"Transactions have, between the interested parties, a force equal to the authority of things adjudged. They can not be attacked on account of any error in law or any lesion. But an error in calculation may always be corrected."
The jurisprudence is to the same effect. In quoting from Russ v. Union Oil Co., 113 La. 196, 205, 36 So. 937, it was stated in Stoufflet v. Duplantis, 208 La. 186, 23 So.2d 41, 44:
"`There is no rule of law, morals, or ethics which denies to the ordinary citizen the right to compromise, with the person asserting it, a claim against him for damages, nor is that right defeated by any previous employment of counsel to prosecute such claim; and, when the compromise is effected in the manner provided by law, it has the force of the thing adjudged, and cannot be attacked collaterally, or for error of law or lesion, in a direct action. Civ.Code, arts. 3071, 3078-3080; Adle v. Prudhomme, 16 La.Ann. 343; Ackerman v. McShane, 43 La.Ann. 507, 9 So. 483; Oglesby v. Attrill, 105 U.S. 605, 26 L.Ed. 1186.' Russ v. Union Oil Co., 113 La. 196, 36 So. 937, 940. Also see: Cassidy v. Joseph, 204 La. 664, 16 So.2d 225; Misuraca v. Metropolitan Life Ins. Co., 199 La. 867, 7 So.2d 167; Sellwood v. Phillips, 185 La. 1045, 171 So. 440; Breard v. Pyramid Oil & Gas Co., 191 La. 420, 185 So. 303; Jackson v. United States Fidelity & Guaranty Co., La.App., 199 So. 419; Beck v. Continental Casualty Co., La.App., 145 So. 810; 14 T.L.R. 287."
Therefore, it is important to first determine whether the transaction or transactions relied upon by defendants constitute a compromise and settlement between the parties. Where such a defense is made, plaintiff may question the existence of such an agreement or settlement of compromise without formally pleading the same inasmuch as under our system of pleading replies or replications are unauthorized. That, he has done here and submits that the transaction relied upon never ripened nor culminated in a compromise settlement or agreement.
The evidence discloses that defendants' adjuster visited plaintiff in the hospital for the two-fold purpose of obtaining a statement of his version of the accident and of making an offer of settlement. This offer of $100 to settle all claims for personal injuries, but without prejudice and with full reservation of plaintiff's rights under the medical payment features of the policy, was made to plaintiff. Pursuant to this, a document, styled "Release of all Claims", was prepared and signed by defendant wherein the payment of $100 was acknowledged as received, which was admitted not to have been paid at that time.
In our view of the facts and circumstances, the execution of the draft for said sum and its mailing to plaintiff August 31, 1949, was simply and merely a continuation of the offer of settlement made by defendants, through their adjuster, to plaintiff. The draft was not accepted and never cashed, and, consequently, there was no final acceptance by plaintiff of the offer of settlement made by defendants. LSA-C.C. Art. 1798 provides:
"As there must be two parties at least to every contract, so there must be something proposed by one and accepted and agreed to by another to form the matter of such contract; the *350 will of both parties must unite on the same point."
The record supports this conclusion. As stated, it was one of the purposes for which the adjuster visited plaintiff in the hospital that he make plaintiff an offer of settlement; plaintiff did not search out defendants' agents or the adjuster but he was sought out on his sick bed in a hospital, suffering from a badly shattered arm and under the influence of strong sedatives, morphine, aspirin, codeine and nembutal. He was in no condition, according to the medical testimony, to either make or accept an offer of settlement. He did not have the mental capacity, at the time, to enter into a contract. We are not unmindful of the fact that if a compromise settlement had been entered into, regardless of the causes for which it may be set aside, it could be assailed and its rescission demanded only in a direct action. Where the very existence of a compromise settlement is denied by plaintiff in opposition to defendants' plea, the question may be raised and determined without the institution of a direct action.
A consideration of this matter, however, from a viewpoint most favorable to defendants, would bring no comfort nor relief to them. Therefore, if it could be considered, at the most, that the execution by plaintiff of the so-called release was an offer of settlement or a continuing offer of settlement on his behalf, which could or would culminate in a final and binding agreement and contract of settlement by the defendants executing their draft in payment thereof, these documents fail to establish that the acceptance complied with the terms of the "offer", or that there was a meeting of minds of the parties upon all phases and terms of the subject-matter. For instance, in the document referred to as a release, plaintiff's rights for medical coverage under the policy were reserved, the particular language used being:
"But That Such Rlease Does not Prejudice His Right Under Medical Payments Coverage Of Policy No. FM5684."
The said draft contained no reservation of plaintiff's rights under the provisions of the policy pertaining to medical expense. For instance, the face of the draft, after its date and number, reads:
"Pay To The Order Of Marion A. Benson......$100.00 and 00 Cts...... Dollars ($100.00) In Full Payment Of (* * *) All claims on account of injuries sustained by Marion A. Benson in Springhill, La. on or about 8-13-49."
Receipt of this settlement plaintiff would have had to acknowledge by accepting and endorsing the draft, which, on its reverse side, and over a line on which he was to endorse and sign his name, has this notation:
"The endorsement of this draft constitutes a release and receipt in full payment of the account as stated herein".
There was, therefore, in this draft no provision for preservation or reservation of his rights as to medical payments. If the draft was an acceptance of plaintiff's offer, such failed to complete a valid contract as there must have been an acceptance of the offer in toto without variation or exception. An acceptance to constitute a contract must be identical with the offer, and where the acceptance of a proposition varies its terms, there is no contract. A proposition does not become an agreement until accepted by the party to whom it is made and then precisely as made. LSA-C.C. Art. 1805 provides:
"The acceptance to form a contract must be in all things conformable to the offer; any condition or limitation contained in the acceptance of that which formed the matter of the offer, gives him, who makes the offer, the right to withdraw it."
Moreover, a modification in the acceptance such as here where the reservation of the rights to medical payments was eliminated, constitutes in effect a new offer, which, however, in order to become a binding *351 contract, must be accepted by the one first proposing. LSA-C.C. Art. 1806. There was no acceptance by plaintiff of the modification proposed by defendants. Plaintiff testified that when he read on the draft "All claims on account of injuries that had been received", he put the draft aside and didn't cash it. That much he had a right to do, and his right of rejection is not affected by the subsequent payment of $935.50 as the balance of the maximum limitation of medical expense stipulated in the policy. Whether such payment would have been made had plaintiff accepted the draft and signed a full release is immaterial and could not have altered or changed a relationship which had been determined by the previous actions of the parties. It would have been at the time of the submission of the draft a matter of conjecture only.
For the above reasons we conclude that defendant's plea of res adjudicata was properly overruled.
As to the second defense, the evidence does not support the conclusion that plaintiff and the driver of the automobile were on a joint mission or engaged in a joint adventure. The trial judge correctly so held.
It was next contended that Tyler was not negligent. His testimony as to his speed, while varying from prior statements, shows that he was driving at a rapid rate of speed. He testified that it was late at night, that he was in a hurry to get home, and that he was driving 65 to 70 miles per hour. From all the testimony, we are convinced he was driving in excess of 60 miles per hour, which, under the circumstances, was dangerous at night. He was familiar with the fact that in that territory livestock roamed at large; he was also familiar with the warning or caution signs to that effect. The testimony does not disclose with any degree of certainty the exact distance from the top of the hill over which the car passed to the point of impact with the mule on the highway. Tyler testified that plaintiff's counsel stepped off the distance, exceeding 200 steps, in his presence when he pointed out the location of the accident. There was no obstruction to view after reaching the crest of the hill and thereafter, from the fact that the road was practically straight and considering the distance to the mules, there was ample time, space and opportunity for the driver to have taken precautions to avoid the accident, which he said he did not do but continued forward, swerving the car to the left to miss the mules and then to the right to avoid a collision with a car approaching from the opposite direction, which maneuver resulted in the car striking the mule and causing the damage and injuries inflicted on plaintiff. Tyler's speed, failure to keep a proper lookout and to take precautions to avoid the accident constituted the sole and proximate cause thereof.
Defendants' contention that plaintiff was familiar with Tyler's driving, to which he made no protest, and that he should have and could have observed the mules on the highway and warned the driver thereof, and that he failed to keep a proper lookout for his own safety, are equally without merit. There is no showing or contention that Tyler was an incompetent or otherwise unfit person to drive and operate an automobile. Plaintiff was within his rights to reasonably rely upon the driver for the exercise of necessary care and caution. No sufficient reasons were shown to deprive him of the right to so rely. In Herget v. Saucier, 223 La. 938, 67 So.2d 543, 545, it was stated:
"Generally, a guest passenger is not required to keep a constant lookout for the dangers of the highway, or to pay attention to the ordinary road and other traffic conditions incident to automobile driving, it being his right and privilege to place reasonable reliance upon the driver in charge of the car for the exercise of the necessary care and caution. Of course, if he is aware of a danger ahead which apparently is unknown to the driver, or if he observes that such driver is incompetent or otherwise unfit to operate *352 the machine, a duty devolves upon him to take some precautionary action. White v. State Farm Mutual Automobile Insurance Co., 222 La. 994, 64 So.2d 245 (and authorities cited in both majority and dissenting opinions thereof)."
Immediately prior to the collision plaintiff may have been asleep or dozing. The evidence is not too clear on this point. At any rate, his arm and elbow were resting on the window ledge of the car and he had been leaning over resting his head, but, from the maneuvers of the car, he was suddenly aroused and lifted his head. Under the facts and circumstances disclosed it does not appear that plaintiff, a guest in the automobile, would have been negligent in falling asleep. The record does not disclose any circumstances as would require the plaintiff, as guest in the car, with no outward appearance of danger, to keep awake and observe the road ahead. He had a right to assume, in the absence of specific circumstances of danger, that the driver was properly operating the automobile in which he was a guest. No condition has been shown that would have required plaintiff to have warned the driver had he been awake. The general rule is stated in 4 Blashfield's Cyclopedia of Automobile Law and Practice, Permanent Edition, Page 583, Sec. 2432, as follows:
"It does not necessarily show negligence on the part of a passenger in an automobile that he was sleeping before and at the time of an accident caused by the negligence of the driver which results in injury to such passenger. However, a passenger cannot escape the obligation of due care whenever the occasion arises for its exercise, on the plea of having fallen asleep, if an ordinarily prudent person would not have fallen asleep under the same or similar circumstances. As said by a Louisiana Court of Appeal, quoting the foregoing statement of the law, the question whether such action on the part of the guest is negligence depends on the facts and circumstances of each case."
See Weddle v. Phelan, La.App., 177 So. 407, 409-410.
Finally, it is urged that one who voluntarily places himself in a perilous position in or on a vehicle on which he is riding is guilty of negligence. Specifically, it is charged that Benson was riding with his right arm on the window ledge of the vehicle, with his elbow and a portion of his arm extending out beyond the automobile. Appellant contends that if Benson had not placed his arm in this position it would not have been injured, citing in support thereof the case of Jakubec v. Southern Bus Lines, Inc., La.App., 31 So.2d 282. The cited case is inapposite here. There it was contended that the plaintiff's arm protruded outside the bus and that such caused the injuries inflicted by the arm striking the girder of a bridge over which the bus was passing. While the court found that plaintiff's arm was not outside the bus and that he sustained injuries while in a position wholly within the bus, that case, had it been found otherwise, would have been clearly distinguishable from the case now before us. Motorists and passengers are fully aware of bridge girders and the close proximity in which passing vehicles approach such girders in traversing bridges of that description. The record fails to disclose any facts or circumstances that would lead plaintiff to believe or suspect, or to presume, that the automobile in which he was riding on a paved road traversing open country would be driven in such close proximity to a loitering mule that the mule would stick his nose and head against the side of the passing car the impact from which would break plaintiff's elbow, protruding, at the most, only a few inches over the window ledge.
In Davis v. Department of Highways, La.App., 68 So.2d 263, 267, this court, in an opinion of Judge Gladney, disposed of a very similar situation. There it was stated:
"It is also urged that one who places himself in a perilous condition in or on a vehicle on which he is riding, is *353 guilty of negligence. Specifically, it is charged Davis prior to and at the time of the accident had his arm protruding through the opening in the door and outside of the truck he was driving. Appellant contends if Davis had not placed his arm in this position it would not have been injured. Cited in support of this doctrine are the following cases: McCoy v. Louisiana N. W. R. Co., 1915, 136 La. 987, 990, 994, 68 So. 100; Babin v. New Orleans Ry. & Light Co., 1916, 139 La. 822, 823, 824, 72 So. 288; Hogg v. Kansas City S. & G. Ry. Co., 1916, 139 La. 972, 974, 976, 72 So. 705.
"The first named case held plaintiff guilty of contributory negligence because of his presence on a platform of a railway coach when the train collided with another. The facts are inapposite. In Babin v. New Orleans Ry. & Light Co., Babin was held negligent when he ignored warnings and extended his elbow beyond the side line of the street car and it was injured. In Hogg v. Kansas City S. & G. Ry. Co., plaintiff was held negligent when injured while riding on the steps of a train coach.
These cases rest on special circumstances which are unlike the mere use of the window of the truck he was driving as an arm rest. The protrusion of an automobile driver's arm out of the window at his side, in the absence of unusual circumstances, is not indicative of carelessness. In Hadrick v. Burbank Cooperage Co., Inc., La. App.1938, 177 So. 831, 833, it was said:
"`There can be no doubt, however, that it is not negligence for a passenger to permit a portion of an arm or a hand to extend only a few inches beyond the side of the vehicle in which the passenger is riding. See Summers v. Crescent City Railroad Co., 34 La. Ann. 139, 44 Am.Rep. 419; Clerc v. Morgan's L. & T. R. & S. S. Co., 107 La. 370, 31 So. 886, 90 Am.St.Rep. 319.'
"This holding was approved recently in Sambola v. Public Belt R. R. Commission of City of New Orleans, La. App.1952, 56 So.2d 267."
Lastly for consideration is the question of quantum. The judgment of the lower court awarded plaintiff the maximum contractual liability of the defendant under the policy sued upon. No contention has been made before this court that this award was excessive. A review of the record, in view of the pain and suffering undergone by plaintiff and the permanent effect of plaintiff's injuries, leads us to the conclusion that the award was not excessive. Plaintiff, at the time of trial, was a young man 25 years of age, a student at Northwestern State College at Natchitoches, Louisiani, majoring in health and physical education, participating extensively in all types of athletics and sports, in anticipation of becoming a coach in athletics after graduation. At the time of the accident he had already pursued his course of study for two years, having first entered the College in the fall of 1947. Between sessions he was employed by the International Paper Company at Springhill, Louisiana, and placed in charge of recreation programs and the training of baseball players for the local team. Due to his injuries he was unable to return to college until February of 1950. He has not since been able to participate in any type of athletics and was confronted with the proposition of continuing his course without training that would have been gained by participation in athletic activities and thus lack the ability of demonstration, important and invaluable aspects of training to a coach, and the alternative of changing his course and getting into some other field of endeavor, thereby losing the time, expenses and credits gained in the work already pursued for two years. He determined to continue the pursuit of his course of study with the handicap of a broken arm and elbow.
For the reasons herein assigned, the judgment appealed is in our opinion correct and is affirmed at appellant's costs.
Affirmed.
*354 GLADNEY, Judge (dissenting).
Negotiations between R. D. Coats, a representative of the Metropolitan Casualty Insurance Company of New York, and Marion A. Benson, culminated in the execution of two instruments in writing, which are herewith reproduced:
"Release of All Claims
"Marion Benson, Claimant's) Herein, Being of lawful age, in consideration of the payment of One Hundred and NO/100 ($100.00) Dollars Received This ___ Day Of _____, 1949, Do, For myself, my heirs, Administrators, Executors and Assigns, Hereby Release And Forever Discharge Ted Tyler, M. T. Browning and Metropolitan Casualty Insurance Company, From Any And All Claims, Demands, Actions Or Rights Of Action Of whatever Kind Or Nature, Either in Law Or In Equity, Which I Have Or Have Asserted Or Could Hereafter Assert Against Him Arising From Or By Reason of Injuries Suffered, Sustained By Me On Or About The 13 Day of August, 1949, In, Through Or As A Consequence of Auto Accident while riding in the car driven by Ted Tyler that sideswiped some mules on the Plain Dealing and Springhill gravel Road and as a result of sideswiping these mules my right arm was broken, Or From Any Other Cause Whatever. In Executing This Release, The undersigned Certifies That with Respect To Any Damage To Or Loss Of Property Involved In The Above Described Accident Or Occurrence, No Other Person Has Any Interest Therein. That Further He Fully Understands This Is A Release Of All Claims For Personal Injury. But That Such Release Does Not Prejudice His Right Under Medical Payments Coverage Of Policy No. FM5684.
 "Marion Benson
"Witness:
"Ted Tyler
"R. D. Coats"
 "Claim Draft
The Metropolitan Casualty Insurance Company Of New York
 G 46837
Dallas, Texas, August 25, 1949
Pay To The Order Of Marion A. Benson
 Loyalty Group $100 and 00 Dollars ($100.00)
In Full Payment of (Describe fully nature of payment; whether final or interim, period covered; for damage or loss; or for medical or expense) All Claims on account of injuries sustained by Marion A. Benson in Springhill, La. on or about 8-13-49. On Account of Policy or Bond No. FM-5684
 Class
Key No. Letter File No. Name Of Assured Or Obligee
SW 1 AL 22421 M. T. Browning
Name Of Injured Or Principal Acc. Or Loss Date
 Marion A. Benson 8-13-49
 Payable Through
First National Bank in Dallas Lucian L. Smith
 Dallas, Texas
 32-1
 Loyalty Group"
*355 Above the space for endorsement on the reverse side of the claim draft are the words:
"The endorsement of this draft constitutes a release and receipt in full payment of the account as stated herein."
Benson signed the release and he received the draft or check for $100. The "release of all claims" signed by Benson was performed by the insurance company in the exact manner contemplated by the parties. There was never any dispute between the parties as to the medical payments provided under the insurance policy. In plaintiff's petition it is admitted the medical payments were made. Any issue relating to such benefits is beside the point and foreign to this controversy. The petition, however, entirely fails to mention the "release of all claims" instrument signed by Benson.
At the commencement of the hearings upon plaintiff's suit, appellee filed a plea of res judicata. The plea was overruled by the trial court, but the rights thereunder have been fully preserved. The effect of the majority opinion herein is to overrule the plea of res judicata. By this holding the court permits plaintiff to accomplish by a collateral attack that which he can do only through a direct action of nullity. The admitted acts of the parties disclose the confection of a contract which is voided by our decision only because the plaintiff refused to cash the check. His motive for not doing so is immaterial. The transaction had become an accomplished fact.
The decision of the majority of this court accepts, as it must, that a transaction or compromise when entered into between the interested parties has a force equal to the authority of things adjudged, and cannot be attacked on account of any error in law or lesion, but may be rescinded whenever there exists an error in the person or on the matter in dispute or where there exists fraud or violence. LSA-Civil Code articles 3071, 3078 and 3079. Article 3078 prescribes that the litigant in attacking the validity of a transaction or compromise shall be bound by the same rules of pleading and practice which apply in an action to annul a definitive judgment. Code of Practice Article 610 declares the party praying for the nullity of a judgment must bring his action to annul by means of a petition and the adverse party must be cited to appear as in an ordinary suit. The appellate courts of this state have repeatedly held where a compromise of settlement is not an absolute nullity it cannot be attacked collaterally but a direct action is necessary to set it aside. See Adle v. Prudhomme, 1861, 16 La.Ann. 343; Graham v. Hester, 1860, 15 La.Ann. 148; Massey v. W. R. Pickering Lumber Co., 1915, 136 La. 688, 67 So. 552; Succession of Rouse, 1918, 144 La. 143, 80 So. 229; Beck v. Continental Casualty Co., La.App.1933, 145 So. 810; Hindelang v. Collord Motors, 1942, 200 La. 569, 8 So.2d 600.
In the Succession of Rouse, 1918, 144 La. 143, at pages 153-154, 80 So. 229, at page 233, the court said:
"The plaintiffs are bound by the written agreement or settlement made by them with their father. It is not an absolute nullity. And it cannot be attacked collaterally. A direct action is necessary to set that settlement aside. The suit by plaintiffs for a settlement without referring to the settlement already made with and by them is irregular, and an exception thereto must be sustained." (Emphasis supplied.)
The proper way to meet a collateral attack on an agreement of compromise is by a plea of res judicata. See: Head v. Rex Drilling Company, Inc., La.App.1938, 182 So. 380. An exception of no right and no cause of action may also be used. Chapin v. Federal Transportation Company, La.App.1953, 70 So.2d 189.
For the reasons so stated I respectfully dissent from the majority viewpoint as I am of the opinion it was incumbent upon plaintiff to present in his petition the issue of the validity of the instrument "release of all claims". This he could have done by cumulating his action of nullity with his action for damages. See Chapin v. Federal Transportation Company, supra. The plea of res judicata should have been sustained.